Sophia P. PANDAZIDES, Plaintiff,

v.

VIRGINIA BOARD of EDUCATION, Defendant.

Civ. A. No. 90–1081–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 28, 1992.

As Amended Nov. 16, 1992.

Steven D. Stone, Alexandria, Va., for plaintiff.

Mary Sue Terry, Atty. Gen. of Va., Joan W. Murphy, Asst. Atty. Gen., Richmond, Va., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HILTON, District Judge.

This case was tried before the Court, and upon the evidence presented and argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. This action has been brought under Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 706(8)(B).

2. Plaintiff, Sofia P. Pandazides is 26 years old, a life long resident of Prince William County, Virginia and a graduate of Longwood College in Virginia. Following Plaintiff's graduation from Longwood College, she was employed as a special education teacher at Woodbridge Middle School in the Prince William County School System for a one-year appointment for the 1988–89 school year.

3. The State Board of Education granted Plaintiff a one-year nonrenewable probationary certificate to teach in Prince William County from September 1988 to September 1989 in 1988. Plaintiff's probationary teaching certificate was subject to the condition that she meet the Board of Education's requirement that she pass the National Teacher Examination ("NTE") during the one-year period for which she was granted leave to teach.

4. In 1978 the Virginia General Assembly expressed concern that the certification of teachers did not include any objective determination of competency other than transcript analysis. Because of this concern, the General Assembly established a study committee to examine the appropriateness of competency examination for teachers as a prerequisite to the issuance of a teacher's certificate. HJR 165, 1978 Acts of Assembly 1988–89.

5. Virginia then enacted a requirement that, on or after July 1, 1980, all prospective teachers seeking initial certification must pass a professional teacher's examination prescribed by the Virginia Board of Education.

6. The State Board of Education prescribed the NTE, administered by the Educational Testing Service ("ETS") of Princeton, New Jersey, as its professional teacher's examination prerequisite.

7. In addition to the licensure requirement that teachers pass the NTE, applicants for licensure are also required to have graduated from a Board approved teacher education program at an accredited college or university and must have passed certain required courses.

8. The NTE is composed of two categories of tests: (1) Core Battery, and (2) Specialty Area Tests.

9. The NTE Core Battery provides a comprehensive assessment of the basic knowledge and skills required for the beginning teacher and consists of three separate tests: *Communication Skills, General Knowledge,* and *Professional Knowledge.*

10. The *Communication Skills* test covers listening, reading, and writing.

11. The *General Knowledge* test covers mathematics, science, social studies, literature, and fine arts.

12. The *Professional Knowledge* test covers the knowledge and skills needed for developing plans to meet instructional objectives and their implementation in the classroom, the professional behavior required of a teacher, recognition of students' rights and other aspects of professional behavior.

13. ETS provides a separate score for each test in the Core Battery.

14. The Virginia General Assembly required extensive study prior to establishing passing score levels ("cut scores") for each sub-test in the Core Battery. In 1980 the legislature even required the Board of Education to postpone establishment of cut scores to assure sufficient time for validation study. *See* HJR 180, 1980 Acts of Assembly at 1537.

15. Dr. Lawrence H. Cross of Virginia Polytechnic Institute and State University was hired to conduct a study to determine the validity of the Virginia Board of Edu-

cation's use of the NTE and to recommend proper Core Battery cut scores.

16. Dr. Cross is an Associate Professor of Education Research and Evaluation at Virginia Tech. He received an award for his outstanding research on education from the Virginia Educational Research Association in 1982 and the Dean's Award for Distinguished Research at Virginia Tech in 1983. Dr. Cross has written numerous scholarly articles on testing and education and has done validation research on the NTE in Louisiana and Kansas. He has conducted workshops on testing for school districts in Maryland, Virginia, and Pennsylvania. Dr. Cross conducted a validation study of the Virginia Board of Education's use of the NTE from 1980 to 1983.

17. Dr. Cross's validation study concluded that the skills tested by the NTE Communication Skills Test were strongly endorsed by classroom teachers and by teacher educators as essential functions which were actually needed on a constant basis in the professional teacher's job.

18. The conclusion reached by Dr. Cross in his Virginia validation study that the NTE measured skills necessary for minimally competent performance for certified professional teachers was the same result found in a study of teacher educators and classroom teachers who examined the contents of the Communications Skills Test for ETS in over 15 states.

19. On June 21, 1984, the Virginia Board of Education approved the cut scores for the Core Battery which were recommended by Dr. Cross's validation study. The Virginia Board of Education required that applicants seeking a teacher's license achieve a communication skills test score of 649, a general knowledge test score of 639 and a professional knowledge test score of 639.

20. The Virginia Board of Education placed no limits on the number of times applicants could retake the tests if they failed.

21. Although Plaintiff passed the NTE's general knowledge test on her first attempt and passed the NTE's professional knowledge test on her second attempt, Plaintiff has failed the NTE's communication skills test eight times.

22. The NTE's communications skills test measures the ability of prospective teachers to understand and use elements of written and spoken language.

23. The NTE's communication skills test has four one-half hour sections. They are: listening skills (on tape); reading (multiple choice); writing (multiple choice); and an essay to measure writing skills.

24. The 40 question listening section examines an individual's ability to comprehend, analyze, evaluate and respond to messages. The approximate percentages of questions measuring each listening skill are: comprehension (40%); analysis (25%); evaluation (25%); and feedback response (10%).

25. The 30 question listening section examines an individual's ability to comprehend, analyze, and evaluate reading material. The approximate percentages of questions measuring each reading skill are: comprehension (50%); analysis (35%); evaluation (15%).

26. There are 45 multiple choice questions to evaluate an individual's writing skills. Approximately 60% of the questions measure usage skills, 20% measure sentence correction skills, and 20% measure composition strategies.

27. The final section measures an individual's writing skills with an essay about one specified topic.

28. The NTE's communication skills test is an objective standardized examination designed to have no interaction between an examinee and an exam administrator. The communication skills test was designed to be non-interactive in order to avoid the possibility that the examinee's answers could be cued or shaped by a person administering or interpreting the examination and to present the same challenges to all examinees independent of the qualifications of the administrator.

29. After having failed the NTE communications skills test in June 1987, October 1987, March 1988, June 1988, Septem-

ber 1988, and October 1988, Plaintiff wrote to the Virginia Department of Education asking that she be exempted from the licensure requirement of passing the NTE communications skills section on January 25, 1989. This letter made no mention of any learning disabilities.

30. In a letter dated February 10, 1989, Plaintiff again wrote the Virginia Department of Education in which she stated her belief that "a subtle learning disability prevents me from passing this one part of the NTE." Plaintiff enclosed two letters to support this assertion.

31. Plaintiff's physician, Dr. Rodolpho L. Lopez, stated in a one sentence letter: "It is my opinion that Sophia Pandazides suffers from test anxiety and should be granted exemption from the Communication Skills portion of the National Teacher Examination."

32. A letter from Dr. Vera Williams, Acting Dean of Longwood College's School of Education and Human Services, attributed Plaintiff's repeated failure to pass the NTE's communications skills test to Plaintiff's test anxiety and her "inability to organize her thoughts and time."

33. The letter from Dr. Williams said that she suspected that Miss Pandazides "might" have a learning disability because of Plaintiff's "difficulty in test taking: test anxiety; and difficulty with organizing knowledge and thoughts." Dr. Williams stated that a few years earlier when Plaintiff was one of her students she suggested to Miss Pandazides that she be tested for learning disabilities. Plaintiff did not accept Dr. Williams' offer and Dr. Williams "did not persist in the idea of having her tested so long as she was performing adequately."

34. The Virginia Department of Education denied Plaintiff's request that the Department waive the Commonwealth's requirement that teachers pass the NTE communication test.

35. Plaintiff wrote to ETS in a letter dated March 17, 1989 seeking two special arrangements for taking the Communication Skills Test: "A reader and unlimited response time." In support of this request, she enclosed the same two letters that she had supplied to the Virginia Department of Education.

36. Following further correspondence between ETS and Miss Pandazides, Plaintiff sent a letter dated May 19, 1989 to ETS that enclosed a report from Dr. George Goldman, dated May 16, 1989. Dr. Goldman's summarized his report as follows:

Ms. Pandazides is learning disabled. Auditory processing is the specific skill which is most troublesome for her. The pattern of her scoring and achievement support this conclusion. In addition, she is sensitive to the stresses involved in being tested and is thus operating under an additional burden when evaluated in a group, timed situation. If provisions exist for exceptions to this type of testing, this young woman qualifies. Insofar as her ability to teach special education youngsters, Ms. Pandazides has demonstrated her excellent ability to master the academics involved and is in an unusually good position to understand and empathize with special needs.

37. Based on this report, Miss Pandazides requested that she "be provided the opportunity to read vice [sic] listen to the material, and then provide the answers in an untimed situation."

38. The NTE Program ETS considered this request for special arrangements in accordance with the policies and procedures in the NTE Programs Policy for Testing Examinees with Disabilities.

39. The NTE Programs Policy for Testing individuals with Disabilities was developed in collaboration with the ETS Committee on People with Disabilities to develop sensitive and appropriate testing alternatives for individuals with disabilities who are taking NTE tests to be licensed to practice as classroom teachers and other educational positions.

40. Other than a literal reading for blind test takers, neither the NTE nor any other ETS test are administered on terms which would allow a third person to mediate between the examinee and the test itself. Hearing-impaired test takers are pro-

vided a sign-language interpreter for spoken instruction, but must handle the test content alone.

41. Following the ETS policy of granting special testing accommodations for disabilities when an applicant provides sufficient documentation to justify test accommodations, ETS granted Plaintiff four accommodations, relying solely on the letters Plaintiff had submitted. These accommodations were granted without making any finding or assessment on its own regarding Plaintiff's alleged disabilities.

42. Although the standard duration of the NTE communication skills test is two hours, ETS granted Plaintiff three hours to complete the test, a 50% increase in time.

43. Instead of the standard practice of having examinees rely solely on a tape recording for the NTE communication test's listening skills section, ETS gave Plaintiff a script of the tape used in the listening session.

44. ETS also allowed Plaintiff to use a 1⅞ ips tape recorder so that she could play and listen to the tape section more slowly than the standard tape session. ETS also gave Plaintiff a copy of the examination in regular type.

45. Instead of a standard large testing room filled with other examinees, ETS allowed Plaintiff to use a separate testing room.

46. Plaintiff took the NTE communications skills test twice during June 1989. She took the test on June 17 under standard testing conditions and on June 30, 1989 with accommodations.

47. Although Plaintiff failed the exam on both occasions, she achieved the same score under standard testing conditions as she had under multiple accommodations. In both test sittings, Plaintiff had her lowest percentages of correct answers in the reading and writing test categories, not the listening section. Even without special accommodations, Plaintiff had her highest percentage of correct answers on the listening portion of the test.

48. At the suggestion of Miss Pandazides' attorney, Plaintiff underwent a test battery under the direction of a psychologist, Dr. Edwin N. Carter, whose services Plaintiff's attorney frequently uses in his law practice.

49. In a letter to ETS dated January 25, 1990, Dr. Carter listed the results of a test battery he had given Miss Pandazides to support his conclusion that Plaintiff has learning disabilities associated with auditory attention, the integration of auditory-visual information and expressive language.

50. The psychologist reported that her Verbal IQ was 89; her Performance IQ was 100; her Full Scale IQ was 93.

51. Dr. Carter recommended additional modifications to the NTE communications skills test for Miss Pandazides which would have made the test completely untimed, permitted interaction between the examiner and the test-taker, and permitted Miss Pandazides to talk about her answers with the examiner.

52. Characterizing Dr. Carter's request for expanded accommodations as "extraordinary," ETS denied the request for additional accommodations for Plaintiff on her ninth attempt to pass the exam.

53. In Virginia, the statewide regulatory "Standards for Accrediting Public Schools in Virginia" require that: "The staff shall provide instruction that is educationally sound in an atmosphere conducive to learning and in which students are expected to achieve."

54. The regulatory criteria applicable to this Standard require:

2. *Staff members shall serve as models for effective oral and written communication with special attention to correct use of language and spelling.*

\* \* \* \* \* \*

9. Classroom activities shall be structured and monitored to minimize disruptive behavior.

10. Inappropriate behavior by a student shall be responded to quickly and consistently without demeaning the student responsible for the behavior.

55. The Job Description for the position plaintiff held at Prince William County Schools as a "Self–Contained Special Education Teacher" required generally that she use the students' strengths appropriately to educate the handicapped children assigned to each class. It specifies:

This is accomplished by implementing the child's IEP [Individual Educational Plan] and working with parents and other professionals. When an instructional aide is assigned to the class, the teacher will assure that the aide is properly implementing the teacher's lesson plans. The primary goal of the self-contained special education teacher is to be the educational leader for children assigned to each class.

56. In evaluation by Prince William County Public Schools in February 1989 Plaintiff was rated "needs improvement" in 3 of 5 job categories. Those were: (1) delivery of instruction, (2) classroom management, and (3) planning and knowledge of content. She was rated as an "effective teacher" in only in "providing favorable psychological environment" and "professional responsibilities."

57. To help Miss Pandazides with her teaching shortcomings, Plaintiff's supervisors gave her the assistance of an experienced classroom teacher and guidance in planning lessons.

58. Because of Plaintiff's poor evaluations and her failure to pass the NTE following her first year probationary period, Plaintiff was not rehired on a full-time basis for the next school year, but on a temporary substitute basis until a competent and certified special education teacher was hired to replace her.

59. Mid-way through the school year, her supervisors requested that she be removed from the classroom immediately because of her weaknesses as a teacher. Because school administrators viewed her classroom management skills as "lacking," school administrators sought to avert "a potentially explosive situation."

60. The Superintendent of Schools for Prince William County testified at trial that even if Plaintiff had passed the NTE communications skills test, she would not have been rehired because of her inability to manage her classroom.

61. In evaluation by Prince William County Public Schools in June 1990, Plaintiff received an overall rating as "effective," but still was rated as "needs improvement" in classroom management. The overall rating of "effective" was given when her evaluators knew she would not be returning to that school and in an attempt to be helpful to Miss Pandazides.

62. Plaintiff's psychologist, Dr. Edwin Carter, testified at trial that Miss Pandazides has three learning disabilities: auditory attention, integration of auditory and visual information, and dysnomia, expressive language disorder.

63. Dr. Barbara Knight Given, Director of the Educational Study Center at George Mason University's Graduate School of Education, Co–Chair of the Southeast Regional Learning Styles Center, and Project Director of the Learning Disabilities Certification Project for the United States Department of Education, testified at trial that she has never heard of the learning disabilities Dr. Carter claimed for Miss Pandazides. Dr. Given also testified that after reviewing the documents submitted by plaintiff in this case, including the letters from Dr. Lopez and Dr. Williams, the report by Dr. Goldman, and the report and deposition of Dr. Carter, she found no evidence to support the claim that plaintiff has any learning disabilities.

64. Dr. Given received George Mason University's Distinguished Faculty Award in 1992 and was the George Mason University Honoree for Scholarly Success in 1983.

65. Dr. Given has published numerous articles in scholarly journals and given many presentations throughout the world on learning disabilities.

66. The book, *DSM–3R*, is a nationally recognized directory of mental illnesses.

67. Dr. Given testified at trial that she is familiar with *DSM–3R* and that she could not find the learning disabilities asserted on Miss Pandazides' behalf by Dr. Carter in *DSM–3R*.

68. In his rebuttal testimony, Dr. Carter said that the learning disabilities he diagnosed Plaintiff as possessing could be found in *DSM–3R* "in different places," but not listed in the index per se. "[I]f you know how to use it. Yeah, you will find it there," he said.

### Conclusions of Law

This Court has jurisdiction pursuant to 29 U.S.C. §§ 701–796i.

Section 504 of the Rehabilitation Act of 1973 protects each person who meets the statutory definition of "individuals with handicaps," which is a "person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B). "Major life activities" are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 34 C.F.R. § 104.3(j)(2)(ii). *See* Annot. *Who is "individual with handicaps" under Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.)*, 97 A.L.R.Fed. 40 (1990).

Official analysis and comments on the implementing regulations for the Act clearly state that not all individuals with handicaps are protected by § 504: "It should be emphasized that a physical or mental impairment does not constitute a handicap for purposes of § 504 unless its severity is such that it results in a substantial limitation of one or more major life activities." (42 Fed.Reg. 22685, May 4, 1977.)

■ "The burden is on the plaintiff to establish the existence of an impairment that substantially limits a major life activity as an element of the plaintiff's prima facie case. . . . If the plaintiff fails to establish a prima facie case, it is unnecessary to address the question of reasonable accommodation." *Jasany v. United States Postal Service*, 755 F.2d 1244, 1249–1250 (6th Cir.1985).

■ The plaintiff bears the burden, once reasonable accommodations are shown to have been made, of proving that the accommodations were not reasonable. *Carter v. Bennett*, 651 F.Supp. 1299 (D.D.C.1987).

Section 504 of the Rehabilitation Act provides that:

[n]o *otherwise qualified* individual with handicaps . . . shall, solely by reason of his handicap be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794 (emphasis added).

"The state has the right to adopt academic requirements and to use written achievement tests designed and validated to disclose the minimum amount of knowledge necessary to effective teaching." *United States v. South Carolina*, 445 F.Supp. 1094, 1107–1108 (D.S.C.1977), *aff'd mem.* 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978) (three judge court), *vacated on other grounds*, 425 F.Supp. 789 (E.D.N.C.1977).

■ The Rehabilitation Act imposes no requirement upon educational licensing bodies to lower or to effect substantial modifications of standards to accommodate a handicapped person.

■ The Rehabilitation Act does not impose any affirmative action obligation on recipients of federal funds. *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979).

■ The Rehabilitation Act does not guarantee the handicapped equal results; it assures even handed treatment and the opportunity to participate in programs receiving federal assistance. *Alexander v. Choate*, 469 U.S. 287, 300, 105 S.Ct. 712, 719, 83 L.Ed.2d 661 (1985).

■ "The Rehabilitation Act forbids discrimination based on stereotypes about the handicap, but it does not forbid decisions based on the actual attributes of the handicap." *Anderson v. Univ. of Wisconsin*, 841 F.2d 737, 740 (7th Cir.1988).

■ Section 504 does not prohibit minimum competency tests; nor does it mean

that the handicapped are excused from reasonable standards of minimum competence. *Anderson v. Banks,* 520 F.Supp. 472, 511 (S.D.Ga.1981).

■ The official analysis and comment to federal regulations implementing § 504 clearly demonstrate that the Act is not to be interpreted to negate basic licensure requirements. This is made manifest by use of the term "qualified handicapped person" rather than "otherwise qualified handicapped person," a substitution explained in the official comment on the regulations as follows:

> Throughout the regulation, this term ['qualified handicapped person'] is used instead of the statutory term 'otherwise qualified handicapped person.' The Department believes that the omission of the word 'otherwise' is necessary in order to comport with the intent of the statute because, *read literally, 'otherwise' qualified handicapped persons include persons who are qualified except for their handicap, rather than in spite of their handicap. Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise' qualified for the job of driving. Clearly, such as result was not intended by Congress.* In all other respects, the term 'qualified' and 'otherwise qualified' are intended to be interchangeable.

42 Fed.Reg. 22685, May 4, 1977 (emphasis added).

■ The Rehabilitation Act was not intended to eliminate academic or professional requirements that measure proficiency in analyzing written information by attaining a passing score on a multiple choice test. *Wynne v. Tufts University of Medicine,* C.A. No. 88–1105–Z (D.Mass 1992), [1992 WL 46077, 1992 U.S.Dist. Lexis 2629]; *Doherty v. Southern College of Optometry,* 862 F.2d 570, 575 (6th Cir.1988), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989).

■ The Rehabilitation Act never requires that basic academic standards be altered, or that *substantial modifications* in professional requirements be made to allow entry to a handicapped candidate. *See, Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (nursing program not required to accommodate deaf student nurse's inability to hear); *Doherty v. Southern College of Optometry,* 659 F.Supp. 662 (W.D.Tenn.1987), *aff'd in part, rev'd in part,* 862 F.2d 570 (6th Cir.1988), *cert. denied* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) (optometry school not required to waive or vary exam requirements to accommodate student with a vision impairment); *Anderson v. Univ. of Wisconsin,* 665 F.Supp. 1372 (W.D.Wis. 1987), *aff'd* 841 F.2d 737 (7th Cir.1988) (law school not required to allow another chance to alcoholic student who could not maintain requisite grade point average); *Doe v. N.Y.U.,* 666 F.2d 761, 774–775 (2d Cir.1981) (medical school not required to allow another chance to student whose emotional illness affected her clinical and academic performance.).

■ "That defendant could have provided a different set of reasonable accommodations or more accommodations does not establish that the accommodations provided were unreasonable or that additional accommodations were necessary." *Wynne v. Tufts Univ. School of Medicine,* C.A. No. 88–1105–Z (D.Mass 1992) [1992 WL 46077, 1992 U.S.Dist. Lexis 2629].

■ Courts are prohibited from requiring a fundamental alteration in a defendant's program to accommodate a handicapped individual. *Kohl by Kohl v. Woodhaven Learning Center,* 865 F.2d 930, 938 (8th Cir.), *cert. denied,* 493 U.S. 892, 110 S.Ct. 239, 107 L.Ed.2d 189 (1989).

■ Plaintiff has failed to establish the existence of an impairment that substantially limits a major life activity as required by § 504. Dr. Given reviewed the entire set of exhibits prepared for this case including the letters of Dr. Vera Williams and Dr. Rodolpho Lopez, the report by Dr. George Goldman, and the report and deposition of Dr. Edwin Carter. In all of these documents, Dr. Given found no evidence of a learning disability. Moreover, Dr. Given

testified that the alleged learning disabilities claimed by Dr. Carter, the psychologist plaintiff hired for this lawsuit, could not be found in *DSM–3R*, the nationally recognized directory of mental illnesses. The rebuttal testimony by Plaintiff's psychologist actually confirmed Dr. Given's testimony by stating that the disabilities which Plaintiff asserted could not be directly found in the *DSM–3R* mental illness directory, but were in fact hybrid categories he had pieced together. In addition, Plaintiff's higher communications test scores in the listening skills section with and without accommodations flatly contradict her psychologist's assessment that plaintiff's auditory processing (attention deficit disorder in the auditory modality) was a weakness causing her to fail in Communication Skills.

■■■ Even if Plaintiff were in fact handicapped under the Rehabilitation Act, Plaintiff has failed to establish that the accommodations made by ETS, with the concurrence of defendants, were not reasonable accommodations which were directly responsive to those difficulties which the Plaintiff claimed as disabilities. Unlimited time would not be a reasonable accommodation because similar modifications could not be expected in the job of teaching. The listening, reading and writing skills being measured in the Test of Communication Skills are those judged necessary to competent performance as a beginning classroom teacher. There is some variability in how quickly or slowly a teacher needs to read or write as required on the job, but the real world requirements do not permit totally unlimited time to accomplish work in the classroom such as reading and correcting students' work, working directly with students in groups or as a whole unit, or writing comments and directions for them about their work. The limitations of time are even more demanding when one considers the listening skills required of a classroom teacher. Similarly, interaction with the examiner would have been a fundamental change to the test design which would compromise the integrity of the test as a measure of minimum skills.

■■ The Virginia Board of Education requirement that those seeking a professional license to teach in Virginia public schools pass the Communication Skills Test of the NTE is a reasonable and legitimate professional licensing requirement.

The Communications Skills Test of the NTE accurately measures "essential functions" of the job of teaching in grades 1 through 12 in the public schools of Virginia. The NTE Communications Skills Test measures a prospective teacher's ability to understand and use the elements of written or spoken language.

Because of Plaintiff's poor teaching evaluations and the extraordinary measures taken by her supervisors in pursuit of her removal from the classroom, Plaintiff has failed to establish that she is an excellent or effective teacher despite her inability to demonstrate minimum professional communication skills as measured by the NTE.

Plaintiff is not "otherwise qualified" under § 504 because she cannot perform "essential functions" of public school teacher in Virginia. The ability to read intelligently, to comprehend written and spoken communication accurately, effectively and quickly, and to respond to written and spoken communication professionally, effectively and quickly, are "essential functions" of a special education, public school teacher in Virginia. Moreover, the ability to manage a classroom is an "essential function" for a public school teacher in grades 1 through 12 in Virginia. Plaintiff has failed to prove competence in this essential function.

Those who fail objective examinations that effectively measure qualifications that are reasonably related to the skills necessary to perform professional tasks with competence should not be allowed to skirt the requirements for licensure with the unfounded excuse that their failure resulted from a learning disability. Because I find that Miss Pandazides cannot perform the "essential functions" of a school teacher which the NTE actually measures, and that she is not handicapped under § 504, no additional modifications are necessary to allow her to teach.

Plaintiff has been given reasonable and indeed unnecessary accommodations in taking the Communications Skills Test. Waiver of the test is not a reasonable accommodation because the test objectively measures essential functions of the teaching profession.

There is no evidence on which the Court can conclude that the Virginia Board of Education has discriminated against the plaintiff based on a handicap. Thus, the Court cannot conclude that plaintiff must be excused from meeting the legitimate and valid requirements for a teachers license in Virginia.