For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

**Sofia P. PANDAZIDES,**
**Plaintiff–Appellant,**

v.

**VIRGINIA BOARD OF EDUCATION,**
**Defendant–Appellee.**

**Equal Employment Advisory**
**Council, amicus curiae.**

**No. 92–2378.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 1, 1993.

Decided Jan. 14, 1994.

John Miller West, Bredhoff & Kaiser, Washington, DC, argued (Jeremiah H. Collins, Bredhoff & Kaiser, Washington, DC, Steven David Stone, Alexandria, VA, on the brief), for plaintiff-appellant.

Joan W. Murphy, Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, argued (Stephen D. Rosenthal, Atty. Gen. of Virginia, Jessica S. Jones, Acting Deputy Atty. Gen., Paul J. Forch, Sr. Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, on the brief), for defendant-appellee.

Robert E. Williams, Douglas S. McDowell, Ann Elizabeth Reesman, McGuiness & Williams, Washington, DC, for amicus curiae.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and SPROUSE, Senior Circuit Judge.

## OPINION

ERVIN, Chief Judge:

Sofia Pandazides brought this action against the Virginia Board of Education ("the Board") alleging discrimination on the basis of handicap in violation of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C.A. § 794 (West Supp.1993). Concluding that Pandazides was not "otherwise qualified" for the position of school teacher under § 504, the district court granted summary judgment for the Board. 752 F.Supp. 696 (E.D.Va.1990). Pandazides appealed, and this court reversed and remanded. 946 F.2d 345 (4th Cir.1991). Following remand, the Board moved to strike Pandazides' request for a jury trial, contending that there was no statutory or constitutional right to a jury trial for claims brought under § 504. Following a hearing on this issue on August 14, 1992, the district court granted the motion. A bench trial was held on August 31 and September 1, 1992, and the district court entered judgment in favor of the Board. 804 F.Supp. 794 (E.D.Va.1992). Pandazides appeals on the sole question of the availability of jury trial under § 504. Because we hold that a jury trial is available under § 504 and that Pandazides properly requested relief of a type that triggers this requirement, we reverse and remand for further proceedings.

I.

A.

The facts of this case are set forth in detail in our prior opinion, and we recite them here only briefly. Sofia Pandazides graduated from Potomac High School in Woodbridge, Virginia in 1983, and subsequently enrolled in Ferrum College. After one year, she transferred to Longwood College, from which she graduated in 1988. Pandazides attended Longwood because of its reputation

for training teachers, an occupation that was her career desire and the occupation of several members of her family. While her first year at Longwood was difficult, by graduation she attained a grade point average of 2.7 (on a scale of 4.0) overall and of 3.4 in teaching special education, her major. She also attained Dean's List her last semester at Longwood, and was rated highly in her two semester teaching practicum and student teaching assignments.

In September, 1988, Pandazides accepted an offer to teach emotionally disturbed children at Woodbridge Middle School in the Prince William County, Virginia school district. Virginia requires public school teachers to be certified, as part of which an applicant must attain certain scores ("cut scores") on the various components of the National Teacher Examination ("NTE"), a standardized examination administered by the Educational Testing Service ("ETS"). Recent graduates, however, may begin teaching prior to passing the NTE pursuant to a one-year, non-renewable, probationary certificate. Thus, although Pandazides had not yet passed the NTE, she was employed with renewal of her contract conditioned upon achieving the cut scores on the NTE.

Although the assistant principal's evaluations over the course of the year indicated that she needed improvement in several categories, he told Pandazides that he was very pleased with her teaching as a first-year teacher. Because she had still not passed the NTE by the opening of the next academic year, the school district requested a special waiver from the Board to permit the district to employ her as a "substitute" teacher. This request was granted for a 90-day period, at the end of which the school requested and received permission to extend her employment through the academic year.

Although labeled a "substitute" teacher, Pandazides' responsibilities in the classroom were identical to those of a "regular" teacher. The assistant principal evaluated Pandazides

during this second year, and in her Teacher Evaluation Report at the end of the school year he gave her an overall rating of "E", or effective, the higher of the two categories available. She also received the honor of being selected Woodbridge Middle School's "PTO Teacher of the Month" for February, 1990, and received a letter of congratulations from the principal. Nevertheless, Pandazides still had not passed the NTE by the end of the academic year, and the Prince William County School Board did not reemploy her for the 1990–91 academic year due to her failure to receive certification.

As noted above, the Commonwealth of Virginia requires that prospective teachers obtain certain scores [1] on the NTE before they can be certified to teach in Virginia. The NTE comprises two categories of tests, the Core Battery and Specialty Area tests. The Core Battery itself is composed of three separate tests: Communication Skills, General Knowledge, and Professional Knowledge, with each test having subparts covering more particularized skills. Despite this requirement, the pamphlet the Board distributes describing certification regulations for teachers indicates that modifications in certification requirements can be made in exceptional and justifiable cases, and the Board's pamphlet describing the NTE indicates that if an applicant has a handicap that is of a severity that invalidates the test, the individual will not be required to take that portion of the exam. It is quite clear from the language of the pamphlet that learning disabilities are included in the category of conditions that allow waiver where shown to be appropriate. Waiver can be obtained only through a request to the Board, while special arrangements for testing conditions are made through the Educational Testing Service.

At the time she initiated this suit, Pandazides had passed the General Knowledge and Professional Knowledge units of the Core Battery,[2] but she had not made the cut score established by Virginia on the Communication Skills exam.[3] Between June 1987 and

---

1. The Board, not ETS, sets the cut score necessary for certification.

2. She passed the General Knowledge unit on her first attempt and the Professional Knowledge unit on her second attempt.

3. Although the Board's validation study for the

October 1988, Pandazides took the exam six times to no avail. Because she began to believe, based on a letter she had received from her faculty mentor at Longwood, that she suffered from a subtle learning disability that impaired her ability to perform under the pressurized conditions of the standardized examination environment, Pandazides requested a waiver of the Communication Skills portion of the NTE from the Board. The Board refused to grant such a waiver but referred her to ETS to attempt to make special arrangements to take the exam. Following a series of correspondence, Pandazides requested the test be administered under conditions allowing her to read as well as listen to the material with no set time restrictions. ETS refused this request, but offered more limited modifications, including a separate room in which to take the test, fifty percent more time, a script of the listening portion, and a special tape player that allowed the replaying of the listening portion at a slower rate with no vocal distortion. She took the test under these conditions, as well as under the standard conditions, and failed both times.

Pandazides then underwent a battery of psychological tests under the direction of Dr. Edwin N. Carter, a clinical psychologist who specializes in diagnosing and treating people with learning disabilities. He found that she "has learning disabilities associated with auditory attention, the integration of auditory-visual information and expressive language." In a subsequent declaration, he indicated that Pandazides suffers from three learning disabilities that limit her ability to input auditory information at the normal rate, affect her ability to read quickly, and limit her ability to make herself understood by using examples and paraphrasing her thoughts. While he believed that she was qualified to teach and that these disabilities would negligibly impact her in-class performance, they seriously impaired her ability to take a standardized test such as the NTE under most testing environments. Dr. Carter thus recommended to ETS certain procedures to compensate for Pandazides' handicap, including an untimed examination and the administration of the test by an examiner with whom Pandazides could interact. This request was rejected as "extraordinary." Shortly thereafter, Pandazides brought this action.[4]

### B.

In her amended complaint, Pandazides requested relief in the form of injunctions requiring that all acts of discrimination against her based on her disability cease; that the Board cease using "cut scores" (i.e., minimum passing scores) for people with disabilities, and that the test be administered in a non-discriminatory manner; that the Board "grant full benefits lost or denied, including retirement credits and credit for two years as a contract teacher with the Prince William County School Board"; and that the Board issue a teaching certificate to Pandazides forthwith. She also requested that she "be awarded all other permissible damages against Defendant, subject to her proof pre-

NTE recommended setting a cut score of 644 for the Communication Skills portion of the exam, the Board ultimately adopted a cut score of 649. Thus, Pandazides' score of 647, while good enough under the validation study, fell short of the passing requirement by two points.

4. Prior to oral argument in this case, counsel informed the court that Pandazides sat for the Communication Skills portion of the NTE in its March 1993 administration, apparently under the modified conditions she previously had utilized. She attained the requisite cut score and subsequently received a teaching certificate from the Board. This development does not alter the fundamental questions of this case regarding whether the Board unlawfully discriminated against her on the basis of her handicap by not granting her a waiver from the Communication Skills portion of the exam. Although her subsequent success in passing the contested portion of the NTE and her certification help define the parameters of any damages or injunctive relief available, the Board's argument that the case is mooted misapprehends the function and utility of the mootness doctrine, which has been described as "standing set in a time frame." Monaghan, *Constitutional Adjudication: The Who and When,* 82 Yale L.J. 1363, 1384 (1973). Pandazides' claim of injury resulting from the action of the Board is no less "live" as a result of her success in passing the exam; it is merely easier to ascertain the appropriate remedies, should that be necessary. See *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 630, 104 S.Ct. 1248, 1252, 79 L.Ed.2d 568 (1984) (addressing mootness question and finding live controversy in case under § 504 involving deceased plaintiff).

sented at trial, together with all her costs and attorney's fees incurred," and that she "receive such other further and general relief as the nature of this case and proof presented require for protection of Plaintiff's rights."

After remand from the prior panel decision reversing summary judgment for the Board, the Board moved to strike the demand for a jury trial. Following a hearing on the matter, the district court stated that "this case seeks Title VII relief that has to do with back pay, promotions, job status, those things. There is no right to a jury trial under Title VII. And in any event, I don't believe that the complaint asks for any kind of relief which would entitle you to a jury trial. It asks for equitable relief."[5] The district court then granted the motion to strike the jury request and proceeded to a bench trial, following which it found for the Board.

## II.

■ On appeal, we are presented with the relatively narrow but complex question of whether there is a right to jury trial under § 504. If so, we must then decide whether a jury trial was required under the complaint pleaded in this case, and finally, whether denial of that right by the district court constituted harmless error. The first two issues are questions of law, which we review de novo. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Smith v. Barton,* 914 F.2d 1330 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991). On the question of harmless error, denial of the right to a jury trial constitutes harmless error only if the trial judge would have granted a motion for judgment as a matter of law in favor of the defendants; the standard of review for such a motion is "whether the evidence is such, without weighing the credibility of the witnesses, that there is only one conclusion that reasonable jurors could have reached." *Keller v. Prince George's County,* 827 F.2d 952,

955 (4th Cir.1987). These questions are addressed in turn.

## III.

■ In determining whether a plaintiff is entitled to a jury trial, the point of departure is the statute itself. *Tull v. United States,* 481 U.S. 412, 417 n. 3, 107 S.Ct. 1831, 1835 n. 3, 95 L.Ed.2d 365 (1987). If the statute in question expressly provides for a jury trial, that is the end of the matter. If the statute is silent on the issue of jury trial, then it is necessary to inquire whether a jury trial is constitutionally required under the Seventh Amendment. *Id.; Chauffeurs Local No. 391 v. Terry,* 494 U.S. 558, 564 & n. 3, 110 S.Ct. 1339, 1344 & n. 3, 108 L.Ed.2d 519 (1990).

### A.

Section 504 of the Rehabilitation Act of 1973, as amended, provides in part:

No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C.A. § 794 (West Supp.1993). The statute does not facially authorize suits by private parties, nor does it indicate the procedures involved in such actions or the remedies available for violations; indeed, only in 1978 did Congress address the question of the statute's reach by borrowing the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d et seq.]" for "any person aggrieved by any act or failure to act" under § 504. 29 U.S.C.A. § 794a (West 1985). While this borrowing indicated that there existed some remedial action for a violation of the statute, the implementing provisions of Title VI address *department and agency action* to effec-

---

**5.** The judge also admitted at one point during the hearing that "I haven't looked at this complaint in some time."

tuate the operative prohibition against discrimination "on the ground of race, color, or national origin;"[6] there is again no direct authorization of suits by private parties, much less discussion of the procedures or remedies available to a private party in such an action.

Although the Supreme Court has avoided directly deciding the question of the availability of a private right of action under § 504, see *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 630 n. 7, 104 S.Ct. 1248, 1252 n. 7, 79 L.Ed.2d 568 (1984), every circuit that has addressed this question, including this one, has held that a private right of action exists. *Davis v. Southeastern Community College*, 574 F.2d 1158 (4th Cir.1978), *rev'd on other grounds*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *see also* 3A Larson, *Employment Discrimination* § 106.34 n. 36 (collecting cases). While Congress may have resolved this lingering question in the Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C.A. § 2000d–7 (West Supp. 1993),[7] that statute contains no mention of the jury right at issue in this case. Because neither § 504 nor Title VI provide any guidance on the availability of a jury trial in a private action, it is necessary to inquire as to whether such a right is provided by the Constitution.

## B.

◼ The Seventh Amendment provides, in relevant part, that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." This has been interpreted to extend the right to jury trial to all suits, whether at common law or arising under federal legislation, where *legal* rights are involved:

> The phrase "common law," found in this clause, is used in contradistinction to equity, and admiralty, and maritime jurisprudence.... By *common law*, [the Framers of the Amendment] meant ... not merely suits, which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.... In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever might be the peculiar form which they may assume to settle legal rights.

*Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–47, 7 L.Ed. 732 (1830) (Story, J.) (emphasis in original) (quoted in *Curtis v. Loether*, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260 (1974)). The Seventh Amendment thus requires a jury trial upon demand if the statute creates legal rights and remedies that are "enforceable in an action for damages in the ordinary courts of law." *Curtis*, 415 U.S. at 194, 94 S.Ct. at 1008.

Beginning with *Curtis*, the Supreme Court has established a two-part inquiry to assist in

---

**6.** The full text of § 601 of the Civil Rights Act of 1964 provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C.A. § 2000d (West 1981). Section 504 closely tracks the language of § 601, which was its model.

**7.** The principal impetus of this legislation was to overrule the holding in *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In *Atascadero*, the Court held that the Eleventh Amendment barred private § 504 actions against the state without addressing the question of private actions general-

ly; in overruling this decision, Congress stated that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 794 of Title 29, title IX of the Education Amendments of 1972" and other statutes not relevant to this matter. 42 U.S.C.A. § 2000d–7(a)(1) (West Supp.1993). The second subpart begins: "In a suit against a State...." 42 U.S.C.A. § 2000d–7(a)(2) (West Supp.1993). The Court has unanimously stated in the Title IX context that this statute "cannot be read except as a validation of" the implied private right of action announced in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). *Franklin v. Gwinnett County Public Schools*, —— U.S. ——, ——, 112 S.Ct. 1028, 1036, 117 L.Ed.2d 208, 221 (1992); *id.* at ——, 112 S.Ct. at 1038, 117 L.Ed.2d at 225 (Scalia, J., concurring).

resolving the question of the availability of jury trial under the Seventh Amendment where the statute does not provide the answer facially.[8] First, the nature of the issues involved and the statutory action are examined and compared to 18th–century actions prior to the merger of the courts of law and equity. Second, and more importantly, the remedy available is examined to determine whether it is legal or equitable in nature. *Terry*, 494 U.S. at 565, 110 S.Ct. at 1344; *Tull*, 481 U.S. at 417–18, 107 S.Ct. at 1835.

### C.

A private action under § 504 has previously been characterized as a type of tort or contract action for which suits at law were available if the proper type of damages were requested. *Smith v. Barton*, 914 F.2d 1330, 1337 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991). Other evidence leads us to agree with this conclusion and find that such an action is essentially a form of statutory tort. Thus, on the question of the proper statute of limitations to apply to suits under § 504, many courts have adopted the local statute of limitations for suits sounding in tort, finding such actions to be the most closely analogous. In *Wolsky v. Medical College of Hampton Roads*, 1 F.3d 222, 224 (4th Cir.1993), this court agreed that "Rehabilitation Act claims are injuries to individuals and analogous to personal injury claims." Although we required the district court in that case to apply the statute of limitations applicable to the Virginia Rights of Persons with Disabilities Act rather than the general personal injuries statute, we did so because the disabilities statute was most closely analogous to the Rehabilitation Act, which is the guideline that must be applied, under 42 U.S.C.A. § 1988(a) and *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), in determining the proper statute of limitations. In *Wolsky*, the district court looked to the other circuits that have addressed this ques-

tion and found that they applied the local personal injuries statutes of limitations. In those cases, however, either the states in which the actions arose did not have parallel state statutes prohibiting discrimination on the basis of handicap or these statutes did not provide a limitations period, so the more general personal injuries statute was the most closely analogous statute from which to borrow. Although we agreed with the analytic process that concluded that a Rehabilitation Act claim is essentially a personal injury action in statutory form, because Virginia had clearly enacted a parallel state statute and provided a statute of limitations for it, we determined that "the district court should have looked no further than the Virginia Act" to find the most analogous statute of limitations. *Wolsky*, 1 F.3d at 224.

Indeed, the particular posture of this case makes even more apparent the propriety of characterizing this claim as a tort. Here, Pandazides sues not the school district that refused to hire her, but rather the certifying body, a different state governmental unit, that allegedly refused to accommodate her handicap and thus erected a barrier to her ability to work. As such, it is somewhat analogous to a suit for tortious interference with contractual relations in which the disappointed party to the contract brings a claim against the breach-inducing party. While the instant fact pattern is somewhat atypical under § 504 as it involves a third party to the employment relationship, it is instructive in demonstrating the underlying tort character of § 504 suits generally. Since such tort actions could be brought in either courts of law or courts of equity, it is necessary to address the second question, namely, the character of damages available under § 504.

### D.

The nature of the remedies available under § 504 has been widely disputed. Pursuant to 42 U.S.C.A. § 794a, the remedies available

---

**8.** While in *Terry*, the most recent opinion addressing *Curtis'* approach, Justices Brennan and Stevens questioned the first step of the analysis, both the plurality opinion and the dissent agreed upon the validity of this analytic structure, while disagreeing on the result of its application in this

instance. 494 U.S. at 574–81, 110 S.Ct. at 1349–53 (Brennan, J., concurring); *id.* at 581–84, 110 S.Ct. at 1353–54 (Stevens, J., concurring); *id.* at 565–70, 110 S.Ct. at 1344–47 (plurality opinion); *id.* at 585, 110 S.Ct. at 1355 (Kennedy, J., dissenting).

under Title VI are applicable to the Rehabilitation Act. While the Supreme Court has ruled in both areas that a private plaintiff can recover damages in the form of backpay, it has not directly addressed further remedies under either statute. *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Title VI); *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984) (§ 504). In both areas, lower courts have split over the availability of compensatory or punitive damages. See 3A Larson, *Employment Discrimination* § 106.37 & nn. 64–65 (1990 & Supp.1993) (collecting cases). In *Eastman v. Virginia Polytechnic Inst. & State Univ.*, 939 F.2d 204 (4th Cir.1991), this court found that punitive damages and compensatory damages in the form of pain and suffering were unavailable under § 504.

■ Following our decision in *Eastman*, however, the Supreme Court has revisited this area and as a result *Eastman* can no longer be considered good law. In *Franklin v. Gwinnett County Public Schools*, —— U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court addressed the question of whether money damages are available under Title IX's implied right of action announced in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and found that, at least as to intentional violations of the statute, a full panoply of legal remedies are available. As indicated below, the similarity between Title IX and § 504 requires the same finding in this case.[9]

The Court began by stating that a general presumption exists that all appropriate remedies are available unless Congress has expressly indicated otherwise, and that this presumption "has deep roots in our jurisprudence." —— U.S. at ——, 112 S.Ct. at 1033, 117 L.Ed.2d at 217.

The general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

*Id.* at ——, 112 S.Ct. at 1035, 117 L.Ed.2d at 220.

The Court then examined Title IX to determine whether Congress had so limited the remedies available. It noted initially that *Cannon* found the right of action to be implied, and that, therefore, "the usual recourse to statutory text and legislative history in the period prior to that decision necessarily will not enlighten our analysis." *Franklin*, —— U.S. at ——, 112 S.Ct. at 1035, 117 L.Ed.2d at 220. Because the right is implied, it is "hardly surprising that Congress also said nothing about the applicable remedies." *Id.* Instead, the Court examined "the state of the law when the legislation passed," *id.*, in order to identify the background against which Congress acted and is presumed to have been aware, and then determined that in the prior decade, the Court had found implied private rights of action in six instances, three times approving a damages remedy. Since Congress was aware of the background in

---

9. The Board argues that, even if damages are available under § 504, they are limited to cases of "intentional discrimination," and that the conduct of the Board does not disclose discriminatory animus of a quality that meets this requirement. This argument misconstrues the use of the term "intent" in the context of employment discrimination litigation. As the various opinions in *Guardians* indicate, "intentional discrimination" is treated as synonymous with discrimination resulting in "disparate treatment," which contrasts with "disparate impact." 463 U.S. at 584 n. 2, 103 S.Ct. at 3223 n. 2 (opinion of White, J.) (laying out the various positions taken in the separate opinions). This approach is confirmed by Congress' recent legislation in this area. In the Civil Rights Act of 1991, Congress made this distinction explicit by providing compensatory and punitive damages for actions "against a respondent who engaged in unlawful

intentional discrimination (not an employment practice that is unlawful because of its disparate impact)." 42 U.S.C.A. § 1981a(a)(1) (West Supp.1993). While "intentional discrimination" suffices to recover compensatory damages, Congress requires a heightened showing of discriminatory action engaged in "with malice or with reckless indifference to the federally protected rights of an aggrieved individual" to recover punitive damages. 42 U.S.C.A. § 1981a(b)(1). Not having the question before us, we express no opinion on the issue of the standards necessary to recover punitive, as opposed to compensatory, damages under § 504; we merely hold that requiring a finding of "intentional discrimination" to make out a violation of § 504 that supports a damages remedy places this case within the group of cases generally referred to as "disparate treatment" cases. It does not establish a higher standard of proof.

which private rights of action were being declared and legal remedies provided, the Court deemed its omission of any discussion of the matter of damages as approval of the availability of a broad spectrum of damages. *Id.* at ——, 112 S.Ct. at 1036, 117 L.Ed.2d at 221.

The Court then looked to the amendments to Title IX following its decision in *Cannon* for statutory guidance, "since Congress was legislating with full cognizance of that decision," and concluded that two subsequent amendments to Title IX indicate "that Congress did not intend to limit the remedies available in a suit brought under Title IX." *Id.* First, in the Civil Rights Remedies Equalization Amendment of 1986, 42 U.S.C.A. § 2000d–7 (West Supp.1993), Congress acted to overrule *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), a decision that barred § 504 suits against states on Eleventh Amendment grounds. Congress overruled the Eleventh Amendment's application not only as to § 504 but also as to Title IX, Title VI, the Age Discrimination Act of 1975 "or any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C.A. § 2000d–7(a)(1) (West Supp.1993). One section of the amendment goes beyond this simple overruling of *Atascadero*, however, and states:

> In a suit against a State for a violation of a statute referred to in paragraph (1), *remedies (including remedies both at law and in equity)* are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

42 U.S.C.A. § 2000d–7(a)(2) (West Supp. 1993) (emphasis supplied). While the Court acknowledged that the clause "says nothing about the nature of those other available remedies," it concluded that "absent any contrary indication in the text or history of the statute, we presume Congress enacted this statute with the prevailing traditional rule in mind." *Franklin*, —— U.S. at ——, 112 S.Ct. at 1036, 117 L.Ed.2d at 221 (citations omitted).

The Court also looked to the Civil Rights Restoration Act of 1987, Pub.L. 100–259, 102 Stat. 28 (1988), which broadened the coverage of § 504, Title VI, Title IX and the Age Discrimination Act of 1975 without addressing the question of available private rights of action or remedies therefor. Both amendments came after the Court already had found damages in the form of backpay under Title VI in *Guardians* and § 504 in *Darrone*. Based on these legislative enactments against the traditional backdrop of a full panoply of rights and the Court's decisions in this area, the Court concluded that a private right of action under Title IX provides a full spectrum of remedies to a successful plaintiff.[10]

Because of the strong similarity between Title IX and § 504, we believe that the same result is dictated in this case. As with Title IX, private action at least initially was implied under § 504, so that an inquiry into the legislative history is unavailing. As to the background law at the time of its enactment, § 504 was passed in 1973, just one year after Title IX; indeed, the statutes are almost identical in much of their operative language, with the major exception being the class protected.[11] The Court's analysis regarding

---

**10.** Three members of the Court concurred in the result in *Franklin*. They did not agree with the majority's view that *any* action has a presumption of full remedies available; they felt that "when rights of action are judicially 'implied,' categorical limitations upon their remedial scope may be judicially implied as well." —— U.S. at ——, 112 S.Ct. at 1039, 117 L.Ed.2d at 224 (Scalia, J., concurring). However, they felt that the language in § 2000d–7(a)(2) of the Civil Rights Remedies Equalization Amendment of 1986 quoted above must be read not only as a validation of *Cannon*'s holding providing a right of action under Title IX, but also as "an implicit

acknowledgement that damages are available." *Id.* —— U.S. at ——, 112 S.Ct. at 1039, 117 L.Ed.2d at 225 (Scalia, J., concurring). Thus, the Supreme Court was unanimous on the issue of the availability of damages under Title IX.

**11.** Title IX provides in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C.A. § 1681 (West 1990).

the background presumption of available remedies at the time of enactment applies equally to both laws. And the subsequent amendments of 1986 and 1987, which strongly influenced the Court's analysis as well as that of the concurring justices, covered both statutes; indeed, the 1986 amendment was prompted by a Supreme Court decision that limited actions under § 504, not Title IX. Given the language of § 2000d–7(a)(2), and Congress' focus at the time of its passage on the scope and extent of actions under § 504, we conclude that Congress has not overturned the presumption towards the full panoply of damages in the case of § 504.

### E.

This analysis indicates that, in applying the *Terry* structure to determine the availability of a jury trial, § 504 is best characterized as an analog to a suit in tort, although discrimination suits were not present under the common law. In addition, suits under § 504 provide the plaintiff a full panoply of legal remedies. Thus, in the appropriate case, a jury trial is constitutionally mandated under § 504.

### IV.

Nevertheless, jury trial is not explicitly required in every case under § 504, and "actions seeking [only] equitable relief will be unaffected" by the availability of jury trial for plaintiffs who request proper damages remedies. *Curtis*, 415 U.S. at 198, 94 S.Ct. at 1010; *Smith v. Barton*, 914 F.2d at 1338. It remains for us to determine whether Pandazides requests only equitable relief in her complaint.

The district court characterized Pandazides' damages claim as being "Title VII" type equitable relief limited to "backpay, promotions, job status, those things." However, the demand for relief, while asking for relief in the form of "full benefits lost or denied, including retirement credits and credit for two years as a contract teacher with the Prince William County School Board," also made a broad-ranging request for "all other permissible damages against Defendant." While not every award of monetary relief must necessarily be legal relief, *Terry*, 494

U.S. at 570, 110 S.Ct. at 1347, here Pandazides asks for all permissible damages, which, based on the analysis in *Franklin*, includes legal monetary damages as well. Given this broad request, and the broad availability of damages after *Franklin*, we believe that the district court was clearly erroneous in its conclusion that Pandazides' complaint did not include a request for legal damages.

Even focusing on the remedy of backpay, in this instance it appears that, should Pandazides win at trial, an award in the amount of backpay would not be characterized as an equitable remedy. In *Terry*, plaintiffs were union members who sued their union for its refusal to refer their complaints relating to their discharge to a grievance committee, and demanded damages in the amount of backpay lost. The Court noted that "[g]enerally, an action for money damages was the traditional form of relief offered in the courts of law," although not all monetary damages must necessarily be legal relief. 494 U.S. at 570, 110 S.Ct. at 1347 (citation and internal quotation omitted). It then said that damages are equitable where they are restitutionary, such as in actions for disgorgement, or when they are incidental to or intertwined with injunctive relief. *Id.* at 570–71, 110 S.Ct. at 1347–48. The Court then indicated that, because the backpay being sought was *against the union* and not *against the company*, the backpay could not be characterized as restitutionary. The underlying reasoning is that while the union caused the damages incurred by the union members, the harm is measured by an outside factor, in this case the salary of the employees. The remedy is not backpay *per se*, but rather damages measured by the economic loss caused, which was an amount equal to pay lost.

The facts are similar here. While it may be that backpay received from an *employer* could be characterized as restitutionary and thus equitable, such as in a standard § 504 or Title VII action (an issue not before us), in this instance Pandazides is suing a *third party*, the certifying board. While one component of her monetary damages could be the amount of her income difference, this amount is not backpay as such but rather

compensatory damages measured by the amount of pay lost as a result of the Board's unlawful discrimination, which prevented her from working.[12]

## V.

■ Finally, we must consider whether the district court's denial of Pandazides' right to jury trial constitutes harmless error. As noted at the outset, denial of a jury trial will only be considered harmless where the judge would otherwise have granted defendant's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50, which is only appropriate where "there is only one conclusion that reasonable jurors could have reached." *Keller v. Prince George's County,* 827 F.2d 952, 955 (4th Cir.1987).

To make out a case under § 504 in an employment context, a plaintiff must show that she is an individual with a handicap under the statute; that she is otherwise qualified, which means that she can perform the essential functions of the job in question; that she is excluded from employment because of her handicap; and that the employer is a covered entity under § 504. "When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether a 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1130 n. 17, 94 L.Ed.2d 307 (1987) (citation omitted). Each of these elements is a question of fact. *Pandazides v. Virginia Bd. of Educ.,* 946 F.2d 345 (4th Cir.1991); *McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850 (5th Cir.1993) ("otherwise qualified" and "reasonable accommodation" are questions of fact); *Frye v. Aspin,* 997 F.2d 426, 428 (8th Cir.1993) ("reasonable accommodation" is question of fact); *Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511 (2d Cir.1991) ("otherwise qualified" is question of fact), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992);

*Fuller v. Frank,* 916 F.2d 558, 562 n. 6 (9th Cir.1990) ("reasonable accommodation" is a question of fact); *Oesterling v. Walters,* 760 F.2d 859, 861 (8th Cir.1985) ("handicap" is question of fact).

A review of the testimony introduced at trial persuades us that both sides introduced sufficient conflicting evidence on each of these questions that the district court could not properly have granted a motion for judgment as a matter of law. Sufficient evidence was introduced that Pandazides is handicapped, that she is otherwise qualified, that she can perform the essential functions of the job or that she could perform under circumstances of reason able accommodation, and that the accommodation offered was not reasonable. We do not comment on the merits of any of these elements; we merely note that the evidence introduced would withstand a motion for judgment as a matter of law. This being the case, the error is not harmless. The judgment of the district court is therefore reversed, and the case is remanded for trial before a jury.

*REVERSED AND REMANDED.*

---

**12.** This is in accord with the "tort" nature of this action. Where a plaintiff sues a breach-inducer for tortious interference with a contract, the principal, but not sole, remedy is damages measured by the loss under the contract or consequential damages limited by the rule of *Hadley v. Baxendale.* 2 Dobbs, *Law of Remedies* § 6.6(2) (1993).