Harvey Vernon LEWIS, et al., Plaintiffs,

v.

The SCHOOL BOARD OF LOUDOUN COUNTY, et al., Defendants.

Civ. No. 92–394–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 17, 1992.

Victor Michael Glasberg, Victor M. Glasberg & Associates, Alexandria, VA, for plaintiffs.

Virginia Rose Manhard, [COR LD NTC], Office Of The Attorney General, Shirley Kathryn Spruill, [COR LD NTC], Hazel & Thomas, Richmond, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiffs Harvey Vernon Lewis ("Vernon") and his mother, Gwendolyn Lewis ("Ms. Lewis") bring this action against the Loudoun County Board of Education ("Loudoun County") and the Loudoun County Superintendent of Schools, alleging that under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, Loudoun County owes the plaintiffs reimbursement for one year of tuition and other costs associated with sending Vernon to a private special education facility. Specifically, plaintiffs contend that this reimbursement is compelled by the IDEA because Loudoun County's individualized education plan ("IEP") for Vernon was not adequate for his needs. The action came before the Court for bench trial. Finding that the Loudoun County IEP for Vernon's education within the public school system met the IDEA standard, the Court rejects the plaintiffs' claim and enters judgment in favor of the defendants.

### Facts

Vernon is a fifteen year-old resident of Loudoun County, Virginia, who has a learning disability primarily affecting his visual motor speed. As a result, his rate of production of written work is impaired. In addition, in November 1983, Vernon was diagnosed as having an Attention Deficit Disorder.[1] Testing indicates that Vernon has at least average intellectual ability.[2] Defendant Loudoun County, the public entity responsible for Vernon's education, receives federal funds pursuant to the IDEA. Defendant Edward B. Hattrick, III, is superintendent of the Loudoun County public schools.

Vernon attended the Loudoun County public schools from Fall 1983, when he began the First Grade, until Spring 1991, when he completed the Seventh Grade. He has received special education services ever since being required to repeat the First Grade in 1984. Vernon's mother, Ms. Lewis, has participated in the formation, and consented to the implementation, of each of the annual IEP's formulated by Loudoun County for Vernon.[3] During the 1990–91

---

1. Attention Deficit Disorder is a developmental disorder characterized by levels of inattention, impulsiveness, and sometimes hyperactivity that are inappropriate to a child's mental and chronological age.

2. Vernon scored in the average range on two administrations of the WISC–R in 1986 and 1989. An earlier test in 1983 also indicated an average IQ. Vernon scored slightly higher on the WISC–R in 1990, which may have been attributable to having taken the same test only eight months earlier. The relatively minor variations in these results are not material to the disputed issues.

3. The IDEA requires state educational agencies to develop general policies and procedures pursuant to which disabled children are provided special education. *See* 20 U.S.C. §§ 1412–1414. The statute and the accompanying regulations require local educational agencies to develop and implement an "individualized education plan" ("IEP") for each disabled child. 20 U.S.C.

school year, Vernon attended the Seneca Ridge Middle School ("Seneca Ridge"). Pursuant to his 1990–91 IEP, Vernon was assigned to the special education resource room at Seneca Ridge for three periods of each school day. Even so, during that year Vernon's academic performance deteriorated, and he failed several classes.

On or about June 24, 1991, Loudoun County began development of an IEP for Vernon for the 1991–92 school year. Ms. Lewis participated in the first day of Vernon's IEP development meeting, but chose not to return for the second day of the meeting. Loudoun County nonetheless completed the 1991–92 IEP, which provided for Vernon's placement in a self-contained learning disabilities program at Seneca Ridge. The program in which Vernon would have been placed pursuant to the 1991–92 IEP averaged six to seven students per class and each class was staffed by a trained teacher and a teacher's aide. In this program, Vernon would have received special instruction in all of his academic subjects, but would have been "mainstreamed"[4] in Band and Physical Education classes and, for the second semester, in a computer keyboarding class.

Ms. Lewis was dissatisfied with the 1991–92 IEP and, beginning in Fall 1991, she removed Vernon from the Loudoun County public schools, placing him instead in the Chelsea School, a private day school located in Maryland, which Vernon had attended in Summer 1990. The Chelsea School has 87 students, all of whom are learning disabled. On July 16–17, 1991, a statutory due process hearing was held pursuant to Ms. Lewis's request.[5] At this hearing, plaintiffs challenged the adequacy of the 1991–92 IEP and requested that Vernon be placed in the Chelsea School at public expense. On September 14, 1991, the local hearing officer denied plaintiffs' request and ruled that the Loudoun County IEP was adequate. Plaintiffs appealed the ruling of the local hearing officer to a state review officer,[6] who affirmed the ruling. On March 20, 1992, plaintiffs appealed the decision of the state review officer to this Court.[7]

### Analysis

Federal law requires that all states receiving federal educational assistance ensure that each disabled student in the state receive "a free appropriate public education." 20 U.S.C. § 1412(1). This free appropriate public education is "tailored to the unique needs of the handicapped child" by means of the IEP. *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 181, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982); *see* 20 U.S.C. § 1414(a)(5). If a child is placed in a private facility as a means of carrying out the state's duty to provide the child with the requisite special education, the state must bear the expense of the private facility. 20 U.S.C. § 1413(a)(4)(B)(i). But the state is not obligated to pay for nonpublic schooling "if a handicapped child has available a free appropriate public education and the parents choose to place the child in a private school or facility." 34 C.F.R. § 300.403(a).

If a parent and the state disagree regarding whether the public school IEP is appropriate, the parent may invoke certain due process procedures to resolve the disagreement. 34 C.F.R. § 300.403(b). In the instant case, Ms. Lewis properly invoked such procedures, and this action is an appeal from the outcome of that process.[8]

§ 1414(a)(5); 34 C.F.R. § 300.341. The local agency is responsible for preparing the child's IEP with the parents' participation. 34 C.F.R. § 300.344.

4. "Mainstreaming" refers to the practice of placing a special education student in certain classes with students who are not receiving special education. The IDEA requires learning disabled students to be mainstreamed "to the maximum extent appropriate." 20 U.S.C. § 1412(5)(B).

5. *See* 20 U.S.C. § 1415(b)(2).

6. *See* 20 U.S.C. § 1415(c).

7. *See* 20 U.S.C. § 1415(e)(2).

8. In addition to the statutory framework contained in Title 20 of the U.S.Code relating specifically to special education, plaintiffs have brought claims under the more general provisions contained in Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which state that "no otherwise qualified handicapped individual ... shall, solely by reason of his handi-

■ The standard to be employed in assessing whether or not a particular IEP provides a student with an "appropriate" education is whether the IEP provides "personalized instruction with sufficient support services to enable the handicapped child to benefit educationally from that instruction." *Hessler v. State Bd. of Educ. of Maryland,* 700 F.2d 134 (4th Cir.1983); *see also Rowley,* 458 U.S. at 201, 102 S.Ct. at 3048 (IEP must "provide educational benefit to the handicapped child"). Significantly, the federal courts, including the Fourth Circuit, have held that the law does *not* impose an "obligation to provide the ... plaintiff the best education, public or nonpublic, that money can buy." *Hessler,* 700 F.2d at 139. Nor is it true that "because a given school is allegedly more appropriate than another school, the less appropriate school becomes inappropriate." *Id.* Plaintiffs bear the burden of proving that the state review officer's determination was erroneous. *Barnett v. Fairfax County School Bd.,* 927 F.2d 146, 152 (4th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991). And in this circuit, reviewing courts must consider the determination of the hearing officers to be *prima facie* correct. *Doyle v. Arlington County School Bd.,* 953 F.2d 100, 105 (4th Cir.1991).

Plaintiffs attack the due process review of Vernon's IEP on both procedural and substantive grounds. Plaintiffs' procedural arguments are addressed first. Several of plaintiffs' procedural objections, such as the improper selection of the hearing officers, inadequate training of the hearing officers, and alleged irregularities in the scheduling of the hearings, were addressed and disposed of in connection with a prior order of this court, dated May 22, 1992 (Bryan, J.), dismissing defendants James W. Dyke, Jr., Secretary of Education, and the Commonwealth of Virginia Department of Education. Most of plaintiffs' remaining procedural contentions, such as the lack of specificity of the IEP, the inappropriateness of the IEP, and the hearing officers' failure to address certain issues in their rulings, are not truly procedural objections at all, but rather substantive arguments, discussion of which is subsumed in the analysis, *infra,* regarding the validity of the IEP and the merits of the hearing officers' rulings.

■ The one genuinely procedural objection, not disposed of by the this Court's prior order, is plaintiffs' claim that the state review officer did not admit certain evidence plaintiffs had offered. According to 34 C.F.R. § 300.510(b)(3), the state review officer shall "[s]eek additional evidence if necessary." Plaintiffs contend that the grades earned by Vernon at the Chelsea School in the time interval between the local hearing officer's ruling and the state review officer's hearing were necessary evidence in evaluating the appropriateness of the Loudoun County IEP. The review officer disagreed and declined to consider the evidence.

■ Clearly, the review officer's determination on whether or not the evidence was "necessary" was a discretionary decision. With regard to such decisions, the rulings of the hearing officers are entitled to more than the customary "due weight" which is accorded to administrative determinations in this context. *C.f. Doyle,* 953 F.2d at 105. Instead, such discretionary rulings must be accorded review on a more deferential "abuse of discretion" standard. In this instance, there can be no doubt that the review officer's decision not to admit the evidence did not constitute an abuse of discretion. The Chelsea School grades, while possibly tangentially relevant to the validity of the Loudoun County IEP, had no necessary relationship to that ultimate

cap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Plaintiffs make no claim that the substantive right to a free education is any broader under Section 504 than under Title 20, and the Court discerns no reason why the defendants' duties should be any different under the respective statutes. Accordingly, the ensuing legal analysis will proceed exclusively under Title 20. *See Doe v. Maher,* 793 F.2d 1470, 1479 (9th Cir.1986) (plaintiffs' claims for educational services "not cognizable under section 504"), *aff'd, sub nom. Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1987).

issue.[9] Accordingly, the Court finds no reversible error or reason to remand with regard to the state review officer's evidentiary ruling, or in connection with any of the administrative procedures implemented by the state authorities.

 Fundamentally, this action is an attack on the substantive result reached by both hearing officers regarding the appropriateness of the 1991–92 IEP. Simply put, the Court finds that the Loudoun County IEP described an adequately specific program capable of providing educational benefit to Vernon. Therefore, under the applicable standard of review, the IEP was appropriate. While there was abundant evidence before the Court regarding Vernon's year in the Chelsea School and the beneficial effect that year had on Vernon's educational progress, such evidence is only tangentially relevant to whether the Loudoun County IEP was appropriate. Conceivably, evidence regarding Vernon's experience at the Chelsea School could have shown, by way of comparison, that in certain specific respects the Loudoun County IEP was inadequate.[10] Yet, the evidence did not have this effect. While there can be no dispute that the Chelsea School experience was of benefit to Vernon, and accordingly that it was an "appropriate" educational placement, the evidence did not establish that the Loudoun County IEP was so comparatively deficient that Vernon would not have derived educational benefit from it, and therefore that the educational placement in the Loudoun County public schools was "inappropriate" in any respect.[11]

9. In any event, the issue is of little ultimate significance because, under the terms of 20 U.S.C. 1415(e)(2), the plaintiffs were entitled to present to this Court evidence outside the administrative record. The plaintiffs availed themselves of that opportunity, and the evidence excluded by the review officer was before the Court in the instant action.

10. Certain evidence adduced by the plaintiffs reveals an obvious misconception concerning the standard the Court is obligated to employ in evaluating the adequacy of a public school IEP. Assessment of a public school IEP does not require considering whether the child's educational progress would be faster at a private school. Rather, an IEP is evaluated on its own merits, by considering whether the plan adequately and appropriately addresses each of the child's special needs so as to ensure that the child receives a free appropriate education tailored to those needs. Evidence of a child's private school experience may be relevant only to help explain or shed light on the shortcomings of the public school IEP or to justify reimbursement for private school costs where the public school IEP has been found inadequate. In the instant case, the plaintiffs presented extensive evidence concerning the grades earned by Vernon at both Seneca Ridge and the Chelsea School. There was argument from both sides on whether or not the record revealed that Vernon had achieved better grades at the Chelsea School. Clearly under the applicable caselaw, however, resolution of that question is not essential to the Court's evaluation of the Loudoun County IEP. See Hessler, 700 F.2d at 139 (appropriateness of private school placement does not make public school placement inappropriate).

Moreover, even if the Court were inclined to make a comparison of the educational benefit Vernon would have derived from the respective institutions, such a comparison could not validly be made on the basis of Vernon's grades. Scholastic grades do not, and do not purport to, measure academic performance on any absolute scale. Grades, whether measured by letter or on a 100-point scale, only have meaning in relation to other grades achieved at the same institution. Because there is no objective basis for determining whether a "C" or a "70" is easier or more difficult to earn than a "C" or a "70" at Seneca Ridge, no confident determination can be made, based on Vernon's grades, concerning which institution was more beneficial to Vernon's academic progress.

11. In fact, in at least one respect the public school IEP was superior, given the criteria established by the IDEA. The IDEA directs the state educational agency to:
"assure that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily...."
20 U.S.C. § 1412(5)(B). As mentioned above, the Loudoun County IEP was structured to "mainstream" Vernon in several of his nonacademic classes. The Chelsea School, a facility devoted entirely to the provision of special education, was obviously incapable of providing these "mainstreaming" opportunities.

Specifically, there is ample support in the record and in the testimony of the witnesses before this Court for the conclusion of the hearing officer that:

> The new IEP developed by the Loudoun County Public Schools addresses the academic needs of the child. It will provide the child with a smaller teacher-student ratio than previously and will give him additional help in organizing his learning materials, keeping track of his books, homework assignments, and the processing of information.

Hearing Officer's Report, p. 3. In particular, the Court was persuaded by the testimony of Cathleen Burk, a certified teacher of the learning disabled, who was Vernon's teacher during the 1989–90 and 1990–91 school years, and who testified that Vernon had benefitted in the past, and would continue to benefit, from the special education services in the Loudoun County public schools.

Nor is there any doubt that the 1991–92 IEP was appropriately tailored to Vernon's special needs. Specifically, the evidence established that the IEP addressed Vernon's educational needs in written language, organizational skills, math, and reading, and provided a behavioral management system to help him develop a positive attitude toward school. The IEP incorporated strategies to accommodate Vernon's visual motor learning disability, such as shortened assignments, preferential seating, and the use of organizational notebooks. Specific activities such as keyboarding and use of a computer were included in the IEP to assist Vernon with his slow rate of speed in the production of written work. Significantly, the IEP also contained evaluation procedures, including teacher testing and designation of percentiles for accuracy, to measure Vernon's progress towards meeting the goals and objectives of the IEP.

■ While plaintiffs argue that the remedial measures in the IEP were directed solely at Vernon's visual motor disability, and ignored his Attention Deficit Disorder, the record shows otherwise. Specifically, it shows that various aspects of the IEP such as the low student-teacher ratio and the shortened assignments adequately addressed Vernon's Attention Deficit Disorder. Thus, while it may be true that Vernon profited more from a year at the Chelsea School than he would have from the special education program at Seneca Ridge, plaintiffs cannot escape the fact that Vernon would have derived a significant and statutorily adequate degree of educational benefit from the proposed public school IEP.[12] As noted *supra*, federal law does not impose an "obligation to provide the ... plaintiff the best education, public or nonpublic, that money can buy." *Hessler*, 700 F.2d at 139. As a result, judgment must be entered in favor of the defendants.

Two aspects of this case prompt a final comment *obiter dicta*. First, during the course of this litigation the Court developed the impression, which was later confirmed by the parties, that the issues being litigated in this forum with regard to the "appropriateness" of Vernon's 1991–92 IEP bore little resemblance to the issues which were most prominent during the administrative review of the IEP. Second, in reviewing the record of this case, the Court was struck by the speed with which the disagreement over Vernon's IEP was allowed to deteriorate into a wholly adversarial confrontation featuring entrenched, incompatible positions. Both of these observations help explain why this matter was not amicably resolved. This result invites an inquiry into whether Virginia's procedures for resolving IEP disputes are wholly satisfactory.

To be sure, all litigation, by its very nature, is bound to feature a certain degree of adversarial posturing. Yet, the special character of actions under the IDEA would seem to present enhanced opportunities for consensual and cooperative dispute resolution. At least nominally, both the parents and the school board enter the IEP develop-

---

**12.** Even the plaintiffs must concede that Vernon could have obtained some degree of educational benefit from the Loudoun County public schools, as evidenced by their decision ultimately to return Vernon to the public school system for the 1992–93 school year.

ment process with the same goal: providing the child with a beneficial educational environment suited to his or her special needs. There is no doubt that in this case both sides were committed to that goal.[13] Given this shared goal, there should have been little reason why the parties could not reach an amicable settlement of this dispute. Yet this did not occur. Of course, there may have been many reasons for this failure, but two systemic flaws, related to the observations mentioned above, merit mention as potential causes.

First, the existing system includes no institutionalized mediation process to take over once school administrators and parents have reached an impasse in the development of an IEP. Although parental input is solicited as the IEP is prepared, once a disagreement develops, it appears that the parents are quickly thrust into an adversarial role. Institutionalized mediation opportunities at this stage would help to reemphasize the parties' shared goal and thereby enhance settlement prospects.[14]

A second, related problem is that the existing procedures do not adequately focus the parents' objections to the IEP in a manner that would allow the school system to respond and perhaps to accommodate the parents' concerns. In this case, no enumerated list of the plaintiffs' objections to the IEP was in existence until after the commencement of the trial, when the Court asked that such a document be created. Many of the objections contained in the resulting document dealt with matters that seemingly could have been resolved in the original IEP had the school system been made aware of the alleged shortcomings earlier in the process.

Quite possibly, therefore, Virginia's administrative hearing system may not promote compromise to the extent possible, given the special nature of IEP disputes.[15] In the interest of the children within the coverage of the IDEA, as well as in the interest of efficiency, the system should be modified to include institutionalized mediation [16] and procedures for the early identification of specific IEP concerns.

For the foregoing reasons, judgment has been entered on behalf of defendants. An appropriate order has issued.

---

**13.** This observation, valid for the pre-placement—IEP preparation/evaluation phase, is arguably no longer valid once this phase has been completed, the IEP rejected by the parents, and the child placed in a private facility. Once this occurs, the focus subtly shifts from cooperative efforts to find what might be best for the child to adversarial positions on reimbursement.

**14.** A suggestion that hearing officers should fill the mediation role is off the mark. It is doubtful that a hearing officer's actual and apparent impartiality would survive a vigorous and thoroughgoing mediation effort.

**15.** The point at which liability for legal fees attaches may also play an important role in promoting or discouraging settlement. *See Rossi v. Gosling,* 696 F.Supp. 1079, 1084 (E.D.Va. 1988).

**16.** Massachusetts, for example, has institutionalized mediation, with dedicated mediators, as an option for parties to pursue before resorting to the due process hearing. *See* Massachusetts Department of Education, Chapter 766 Regulations, § 401.0.