MEMORANDUM OPINION
ELLIS, District Judge.
This is essentially an action for educational malpractice.
An 18-year-old plaintiff whose learning disabilities (LD) were only recently discovered, claims that defendants reasonably should have identified his condition in the fourth grade, not high school. As a result, plaintiff claims that for years defendants have denied him equal access to a “free appropriate public education” in violation of the Individuals with Disabilities Education Act (the “IDEA”), § 504 of the Rehabilitation Act of 1973 (“§ 504”), 42 U.S.C. § 1983 (“§ 1983”), 42 U.S.C. § 1985 (“§ 1985”), and the Fourteenth Amendment. For this, plaintiff *1008 claims that he is due compensatory and punitive damages.
For the reasons that follow, this claim is meritless and plaintiffs complaint must be dismissed as failing to state a claim upon which relief can be granted.
I[1]
Plaintiff, Kristopher Sellers, is an 18-year-old high school student enrolled in the Ma-nassas City Public Schools, since at least the fourth grade. Recently, school officials discovered that he is LD and has a emotional disorder.[2] Following this discovery, Kristopher’s parents initiated a so-called “due process” proceeding under the IDEA to contest the school district’s management of Kristopher’s education.[3] As a result of this proceeding, Kristopher and his parents resolved with school officials all educational issues pertaining to Kristopher’s disabilities.[4]
Yet, this did not end the matter; Kristopher and his parents sought more. In particular, they requested that the due process hearing officer award them compensatory and punitive damages for the denial of special education and related services since the fourth grade, owing to defendants’ negligent failure to detect Kristopher’s LD. The hearing officer considered and rejected this request, concluding that he had no statutory authority to award compensatory or punitive damages in the circumstances. The parents promptly appealed this ruling to the state educational agency. On October 10, 1996, the state agency affirmed the adverse decision.
Thereafter, Kristopher filed this four count complaint, seeking compensatory and punitive damages on multiple theories,[5] against the School Board of the City of Manassas, School Superintendent James Upperman, and the Manassas City Public Schools for failing to identify his disabilities since at least the fourth grade. Specifically, Count I alleges that defendants’ failure to provide Kristopher with a “free appropriate public education” violates the IDEA, § 504, and Virginia law. Count II claims that defendants’ failure to test Kristopher for LD and to place him in special education violates the IDEA, § 504, and Virginia law. Count III asserts that the hearing officers erred in determining that they had no statutory authority to award compensatory and punitive damages. And Count IV alleges that defendants’ failure to provide a free appropriate public education constituted a governmental “custom or usage” with the force of law.
On December 10, 1996, defendants filed the instant motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), Fed. R.Civ.P. Thereafter, on February 3,1997, the Court heard oral argument, took defendants’ motion under advisement, and ordered the parties to submit supplemental briefs. The *1009 parties have done so, and hence the matter is now ripe for disposition.
II
Plaintiff cites the U.S. Constitution, four federal statutes, and state common law in support of his compensatory and punitive damages claim. Each of these legal grounds is separately addressed.
A
The centerpiece of special education law is the IDEA, on which plaintiff understandably places chief reliance. Thus, analysis properly focuses first on this statute.
In 1975, Congress enacted the Education for All Handicapped Children Act, Pub.L. No. 94-142, 89 Stat, 773 (1975), now known as the IDEA.[6] The Act’s purpose is “to as-sur[e] that all [] children (with disabilities) have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs.”[7] “To accomplish this ambitious objective, the [IDEA] provides federal money to state and local educational agencies that undertake to implement the substantive and procedural requirements of the Act.”[8] Among the IDEA’S numerous requirements that a state must satisfy in order to receive federal funding are that it identify students with disabilities[9] and that it develop an individualized education program (“IEP”) for each identified student.[10] The IDEA also imposes extensive procedural requirements that guarantee parents access to the pertinent records of their children,[11] written notice of proposed changes to the IEP,[12] and the right to contest decisions at an impartial due process hearing.[13]
Section 615(e) (2), 20 U.S.C. § 1415(e)(2), authorizes parents “aggrieved by the findings and decision” of a state administrative proceeding to bring a civil action in state or federal court and confers upon the courts reviewing those complaints the authority to “grant such relief as the court determines is appropriate.”[14] This is the specific IDEA provision on which plaintiff relies in support of his compensatory and punitive damages claim. Yet, this reliance is misplaced, for it is well-settled that such damages are not available under § 615(e)(2), which “permits a reimbursement remedy, but ... does not create a private cause of action for damages for educational malpractice.” Hall v. Vance County Bd. of Educ., 774 F.2d 629, 633 n. 3 (4th Cir.1985).[15] Thus, the only *1010 “appropriate” type of monetary relief available under the IDEA is restitution or reimbursement.[16] In other words, courts have uniformly limited “appropriate” relief under the IDEA to “repayment” as opposed to “general” damages.
Accordingly, as a matter of law, the IDEA affords no basis for plaintiffs claim for compensatory and punitive damages. It follows, of course, that due process hearing officers have no statutory authority under the IDEA to award such relief.
B
Plaintiffs reliance on § 514 of the Rehabilitation Act of 1973 fares no better.
Unlike the IDEA, § 504 focuses not on creating rights and entitlements but on proscribing certain discriminatory acts.[17] As the Third Circuit put it, “[w]hile the IDEA is phrased in terms of a state’s affirmative duty to provide a free appropriate public education, § 504 is worded as a negative prohibition against disability discrimination in federally funded programs.”[18] To establish a violation of § 504 in this context, a plaintiff must demonstrate that: (1) he is a person with a disability as defined by the Act; (2) he is “otherwise qualified” to participate in school activities; (3) defendants receive federal financial assistance; and (4) he was subject to discrimination solely on the basis of his disability.[19] In sharp contrast to the IDEA, it is well-established that monetary damages are an available remedy under § 504.[20] Nevertheless, to recover such damages, a plaintiff must show intentional discrimination or bad faith in the denial of special education.[21]
Here, Kristopher alleges no facts that might support an inference that defendants acted in bad faith or with an intent to deprive him special education services. Instead, the gravamen of plaintiffs allegations is that de *1011 fendants’ negligent failure to identify his LD in a timely manner deprived him special education services, thereby discriminating against him on the basis of disability. These allegations, however, cannot support a § 504 claim for damages; more than mere negligence must be alleged to rise to the level of a § 504 violation. To hold otherwise would distort and subvert the plain and intended meaning of “discrimination,” ignore settled precedent, and invite a flood of unwarranted litigation in the special education context. The fact is, as the Eighth Circuit has noted, that the evaluation of LD is at best an inexact science on which few experts agree.[22] Were the § 504 standard expanded to include mere negligence, many LD cases would be converted to § 504 discrimination claims for damages based on contentions that the LD should reasonably have been identified and accommodated semesters or years earlier. This is a result Congress, in enacting § 504, neither intended nor allowed.
In sum, Kristopher has alleged no facts that would support a claim of bad faith or gross misjudgment on the part of defendants in failing to identify and provide for his LD sooner. Consequently, Kristopher’s claim for compensatory and punitive damages under § 504 fails.
C
Plaintiffs § 198B claim also fails to state a claim.
Section 1983 provides a civil remedy for acts taken under color of law that deprive “any citizen of the United States or person within the jurisdiction thereof’ of “rights, privileges, or immunities secured by the Constitution and laws.”[23] In other words, “[s]ection 1983 does not confer substantive rights, but merely redresses the deprivation of those rights elsewhere secured.”[24] When the secured right at issue is based on a statute, the statute itself must not foreclose § 1983 enforcement. The IDEA does not restrict such actions because it contains a nonexclusive remedy provision, § 1415(f).[25]
Although violations of the IDEA and § 504 are independently enforceable under § 1983,[26] “that section is a derivative cause of action, creating a private right of action only for deprivation of federal rights enunciated *1012 elsewhere.”[27] In other words, to state a claim for compensatory and punitive damages under § 1983 for violations of the IDEA and § 504, a plaintiff must, at a minimum, state such a claim under the IDEA and § 504. This plaintiff has not done. Accordingly, the motion to dismiss Kristopher’s claim for compensatory and punitive damages under § 1983 must be granted.
D
Kristopher’s § 1985 claim merits the same fate.
It is well-settled that 42 U.S.C. § 1985(3)[28] protects persons only from conspiracies motivated by “some racial, or perhaps otherwise class-based, invidiously discriminatory animus.” Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); see also Pratt v. Thornburgh, 807 F.2d 355, 357 (3d Cir.1986). The complaint contains no factual allegation that defendants’ purported deprivation of plaintiff’s rights under the IDEA stemmed from any proscribed conspiratorial intent. Accordingly, Kristopher’s claims for compensatory and punitive damages under § 1985 must also fail here.
E
Kristopher’s constitutional Fourteenth Amendment due process and equal protection claims are also fundamentally flawed.
It is well-settled that education is not a fundamental right secured by the Constitution and, thus, defendants’ purported failure to provide Kristopher with the most appropriate education is not a constitutional deprivation. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Moreover, defendants aptly point out that Kristopher’s complaint also fails to allege unequal treatment relative to either LD students or non-LD students. Accordingly, any constitutional claim premised on the Fourteenth Amendment must be dismissed.
F
Although Kristopher’s complaint refers to violations of Virginia law, he cites no pertinent Virginia statute and appears instead to rely on a Virginia common law tort of educational malpractice. Yet, the Supreme Court of Virginia has never recognized such a cause of action and it would be inappropriate for this Court to do so in the first instance, for “this Court must await the [ ] decision [of the Virginia General Assembly and the Virginia Supreme Court] before it may” recognize a new cause of action. White v. Federal Exp. Corp., 729 F.Supp. 1536, 1550 (E.D.Va.1990), aff'd, 939 F.2d 157 (4th Cir.1991).[29] It is well-settled that federal courts have “a duty to apply state law as [they] find it,” even where the state rule is “contrary to the trend in other jurisdictions and of debatable wisdom.” Fleming v. Asbill, 42 F.3d 886, 890 (4th Cir.1994). Accordingly, Kristopher’s claim based on Virginia common law fails to state a cognizable claim.
Nor is there any good reason to expect that the Supreme Court of Virginia would conclude otherwise in this case. While there is abundant academic commentary in support of educational malpractice suits,[30] there is *1013 overwhelming judicial authority in opposition to such tort claims. And this is understandable given the weighty policy considerations militating against such suits. Thus, educational malpractice cases typically fit into one of three general categories. In the first, and most prevalent type of educational malpractice action, a student alleges that his or her school negligently failed to provide adequate or sufficient academic instruction in basic skills, such as reading or writing.[31] In the second category, a student claims that he or she was erroneously diagnosed as having a mental disability and, then, detrimentally placed by school officials in an inappropriate special education program.[32] In the third class of cases, a student asserts that school officials negligently failed to diagnosis and treat his or her disability.[33]
*1014 But for the lone exception of the Supreme Court of Montana,[34] the federal and state courts that have considered all three types of educational malpractice claims have unanimously declined to recognize them as valid causes of action. These decisions have identified numerous public policy considerations for not entertaming such claims. The first consideration is “the lack of a satisfactory standard of care by which to measure an educator’s conduct.”[35] The second is the inherent difficulty concerning the cause and nature of damages.[36] The third is reluctance to monitor the internal affairs and day-to-day operations of educational institutions.[37] And the fourth is fear of excessive litigation.[38] It is for the Virginia General Assembly and the Supreme Court of Virginia, not this Court, to weigh and evaluate these policy considerations and decide whether to recognize an action for educational malpractice. In the circumstances, then, Kristopher’s claim, insofar as it relies on state common law, must be dismissed.
For the foregoing reasons, defendants’ motion to dismiss should be granted and plaintiffs’ complaint dismissed in its entirety.

. For the purpose of resolving defendants' Rule 12(b)(6) motion to dismiss the complaint, the facts alleged must be accepted as true. See Estate Const. Co. v. Miller & Smith Holding Co., Inc., 14 F.3d 213, 217-18 (4th Cir.1994); Martin Marietta Corp. v. International Telecommunications Satellite Org., 991 F.2d 94, 97 (4th Cir.1992).

. The complaint does not disclose precisely when this discovery occurred, nor does it reveal the nature of Kristopher's LD and emotional disorder. Neither of these details is necessary to the resolution of the motion at bar.

. When parents and school officials disagree about a student's eligibility, evaluation, programming, or placement, the IDEA entitles parents to an impartial due process hearing. 20 U.S.C. § 1415(b)(2). A hearing officer presides over this proceeding and, in the course of it, allows limited discovery, attempts to facilitate a settlement and ultimately, if necessary, issues a written decision resolving the disputed issues. 20 U.S.C. 1415(c). See Lewis v. School Bd. of Loudoun County, 808 F.Supp. 523, 525-26 (E.D.Va.1992).

. Presumably, this means that the parties managed to design a mutually-agreeable “individualized education program” ("IEP”) for Kristopher pursuant to the IDEA. An IEP outlines the student’s special educational needs and the instruction and related services necessary to meet those needs. 20 U.S.C. § 1401(19). School officials must review and, if necessary, revise each qualified student's IEP at least annually. 20 U.S.C. § 1414(a)(5).

. Specifically, in the first sentence of his five page complaint, Kristopher bases his claim for coppensatory and punitive damages on the following statutory and constitutional grounds: the IDEA, § 504; § 1983, § 1985, and the Fourteenth Amendment of the U.S. Constitution.

. In 1990, the Education for All Handicapped Children Act ("EAHCA") was renamed the IDEA. Education Of the Handicapped Act, Amendments of 1990, Pub.L. No. 101-476, 901(a), 104 Stat. 1103 (1990) (codified as amended at 20 U.S.C. § 1400(a)). Throughout the former EAHCA, the words “handicaps” and "handicapped children disabilities.” at § 901(b) (codified as amended at 20 U.S.C. § 1400).

. 20 U.S.C. § 1400(c).

. Burlington School Committee v. Department of Educ. of the Commonwealth of Mass., 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); see also Hendrick Hudson Dist., Bd. of Educ. v. Rowley, 458 U.S. 176, 181, 102 S.Ct. 3034, 3038, 73 L.Ed.2d 690 (1982); 20 U.S.C. § 1412(1).

. 20 U.S.C. § 1412(C).

. 20 U.S.C. § 1401(18).

. 20 U.S.C. § 1415(b)(1)(A).

. 20 U.S.C. 1415(b)(1)(C).

. 20 U.S.C. § 1415(b)(1)(E).

. The provision provides that:
Any party aggrieved by the findings and decision made [during the state administrative review] shall have the right to bring a civil action ... which action may be brought ... in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall ,.. grant such relief as the court determines is appropriate.

. See also Crocker v. Tennessee Secondary Sch. Athletic Ass’n, 980 F.2d 382, 386 (6th Cir.1992) ("In this case, general damages for emotional anguish ... do not constitute 'appropriate' judicial relief."); Anderson v. Thompson, 658 F.2d 1205, 1210-11 (7th Cir.1981) ("Viewing the language of section 615(e)(2) in the context of section 615 leads us believe that Congress did not envision appropriate relief generally to include a damage remedy."); Barnett v. Fairfax County Sch. Bd., 721 F.Supp. 755, 756 (E.D.Va.1989) ("[I]t has been clearly established that aside from reimbursement to parents for private tuition, compensatory damages are not recoverable under [the IDEA].”), aff'd, 927 F.2d 146 (4th Cir.), cert. denied, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991).

. See Burlington School Committee, 471 U.S. at 370-71, 105 S.Ct. at 2002-2003 (holding that the IDEA merely permits plaintiffs to recover "reimbursement [of] ... expenses that the [municipal government] should have paid all along and would have borne in the first instance had it developed a proper IEP”).

. Specifically,! 504 provides, in pertinent part, that:
No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
29 U.S.C. § 794(a).

. W.B. v. Matula, 67 F.3d 484, 492 (3d Cir.1995); see also Smith v. Robinson, 468 U.S. 992, 1016, 104 S.Ct. 3457, 3471, 82 L.Ed.2d 746 (1984) ("Section 504 and the [IDEA] are different substantive statutes. While the [IDEA] guarantees a right to a free appropriate public education, section 504 simply prevents discrimination on the basis of [disability].”).

. See Johnson v. Thompson, 971 F.2d 1487, 1492 (10th Cir.1992) (quoting Strathie v. Department of Transp., 716 F.2d 227, 230 (3d Cir.1983)), cert. denied, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993).

. See, e.g., Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 830 (4th Cir.1994) (concluding “that Congress has not overturned the presumption towards the full panoply of damages in the case of § 504”); see also Rodgers v. Magnet Cove Public Schools., 34 F.3d 642, 645 (8th Cir.1994) (holding that “money damages are available under § 504”); Waldrop v. Southern Co. Services. Inc., 24 F.3d 152, 157 (11th Cir.1994) (“[S]uits under § 504 provide to plaintiffs the full spectrum of remedies....”); Smith v. Barton, 914 F.2d 1330, 1338 (9th Cir.1990) (citation omitted) (finding that "plaintiffs suing under section 504 of the Rehabilitation Act 'may pursue the full panoply of remedies, including ... monetary damages’”), cert. denied, 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991).

.See Pandazides, 13 F.3d at 830 n. 9 ("We [] hold that requiring a finding of ‘intentional discrimination' to make out a violation of § 504 that supports a damages remedy places this case within the group of cases generally referred to as ‘disparate treatment’ cases.”); see also Heidemann v. Rather, 84 F.3d 1021, 1032 (8th Cir.1996) (citation omitted) (holding that " 'either bad faith or gross misjudgment should be shown before a § 504 violation.can be made out, at least in the context of education of [] children [with disabilities].... ' ”); Whitehead v. School Bd. for Hillsborough County, Fla., 918 F.Supp. 1515 (M.D.Fla.1996) ("Following ... the Supreme Court’s treatment of damages under Title VI, this Court holds that damages are available under § 504 for intentional discrimination.”); Barnett, 721 F.Supp. at 756 ("This court is of the view that before damages can be sought for basic education claims such as those under § 504, there must be a showing of bad faith or intentional discrimination.”).

. According to the Eighth Circuit:
The reference in the Rehabilitation Act to ‘‘discrimination’’ must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a [] child [with a disability] are and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [IDEA] is not necessarily holding that a[] child [with a disability] has been discriminated against solely by reason of his or her [disability]. An evaluation, in other words, is not discriminatory merely because the court wanted the child evaluated differently.... We think, rather, that either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of the education of [] children [with disabilities].
Monahan v. State of Neb., 687 F.2d 1164, 1170-71 (8th Cir.1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983).

. 42 U.S.C. § 1983; Maine v. Thiboutot, 448 U.S. 1, 5-6, 100 S.Ct. 2502, 2504-06, 65 L.Ed.2d 555 (1980) ("Section 1983 encompasses claims based on purely statutory violations of federal laws.").

. W.B., 67 F.3d at 493.

. 20 U.S.C. § 1415(f) provides that:
Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsection (b)(2) and © of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

. See, e.g., Hoekstra v. Independent Sch. Dist, No. 283, 916 F.Supp. 941, 942 (D.Minn.), aff'd, 103 F.3d 624 (8th Cir.1996); Reid v. Board of Educ. Of Lincolnshire-Prairie View Sch. Dist., 103, 765 F.Supp. 965, 969 (N.D.Ill.1991); Grace B. v. Lexington Sch. Comm., 762 F.Supp. 416, 418 (D.Mass.1991); Blazejewski v. Board of Educ. of Allegany Central Sch. Dist., 599 F.Supp. 975, 979 (W.D.N.Y.1985)

. Barnett, 721 F.Supp. at 757.

. This provision prohibits a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...."

. See Perry v. McVey, 345 F.2d 897, 901 (4th Cir.1965) ("In light of the oft repeated authoritative declarations of the Court of Appeals of Maryland, any change in the law must come from the independent authority of the state, not from a federal court which is bound to apply state law in a diversity suit.”); Gravins v. International Playtex, Inc., 586 F.Supp. 251, 252 (E.D.Va.1984) ("As long as representative government exists, there is no excuse for a court arrogating to itself the authority to move the law along some purportedly wise or socially desirable path.").

.See e.g., Sharan E. Brown & Kim Cannon, Educational Malpractice Actions: A Remedy For What Ails Our Schools?, 78 ED. L. REP. 643 (1993); John Culhane, Reinvigorating Educational Malpractice Claims: A Representational Focus, 67 WASH. L. REV. 349 (1992); Johnny C. Parker, Educational Malpractice: A Tort is Bom, 39 CLEV. ST. L. REV. 301 (1991); J. Elson, A Common Law Remedy for the Educational Harms *1013 Caused by Incompetent or Careless Teaching, 73 Nw. U.L. REV. 641 (1978).

. See e.g., Ross v. Creighton University, 957 F.2d 410 (7th Cir.1992) (rejecting a former student-athlete’s claim that Creighton University "committed ‘educational malpractice’ by not providing him with a meaningful education and preparing him for employment after college”); Blane v. Alabama Commercial College. Inc., 585 So.2d 866 (Ala.1991) (affirming the dismissal of the negligence claim brought by a former typing student "who was unable to find employment in the computer/clerical field”); Peter W. v. San Francisco Unified Sch. Dist., 60 Cal.App.3d 814, 131 Cal.Rptr. 854 (1976) (holding that plaintiff’s complaint, which alleged that defendants "negligently and carelessly failed to provide [him] with adequate instruction, guidance, counseling, and/or supervision in basic academic skills," failed to state a cause of action); Moore v. Vanderloo, 386 N.W.2d 108 (Iowa 1986) (rejecting plaintiff's claim that her chiropractor’s college "should be held liable under a negligence theory for failure to teach” that neck manipulation could cause strokes); Wickstrom v. North Idaho College, 111 Idaho 450, 725 P.2d 155 (1986) (declining to recognize the doctrine of educational malpractice in a case brought by "students who successfully completed ‘Maintenance Mechanic’ courses" but who were nonetheless not qualified as entry level journeymen); Finstad v. Washburn University of Topeka, 252 Kan. 465, 845 P.2d 685 (1993) (denying court reporting students’ lawsuit that Washburn was negligent “in the conduct and supervision of the court reporting program”); Donohue v. Copiague Union Free School District, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979) (dismissing plaintiff's negligence claim "that notwithstanding his receipt of a certificate of graduation he lacks even the rudimentaiy ability to comprehend written English on a level sufficient to enable him to complete applications for employment”).

. See e.g., Smith v. Alameda County Social Servs. Agency, 90 Cal.App.3d 929, 153 Cal.Rptr. 712 (1979) (denying plaintiff's claim against state agency “for negligently construing tests administered to [him] as indicating mental retardation”); Tubell v. Dade County Public Schs., 419 So.2d 388 (Fla.Dist.Ct.App.1982) (holding that plaintiff's educational malpractice complaint, which alleged "a mistesting and misclassification resulting in [his] being placed in an improper special educational program for a number of years to his detriment,” failed to state a cause of action); Doe v. Board of Educ. of Montgomery County, 295 Md. 67, 453 A.2d 814 (1982) (dismissing the negligence claim of a former student and his parents against the county board of education for improperly evaluating him as being retarded and for placing him in a “brain injured class”); Hoffman v. Board of Educ. of the City of New York, 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979) (dismissing a student’s complaint that the school's negligent assessment of his intellectual capability “caused him to be misclassified and improperly enrolled in the [Children with Retarded Mental Development] program”); Agostine v. School Dist. of Philadelphia, 106 Pa. Cmwlth. 492, 527 A.2d 193 (affirming the dismissal of a student's claim that the school district's psychologists and teachers negligently diagnosed her as educable mentally retarded (EMR) and improperly placed her in special education classes for such EMR children), aff'd, 517 Pa. 610, 536 A.2d 1334 (1987).

.See, e.g., D.S.W. v. Fairbanks North Star Borough Sch. Dist., 628 P.2d 554 (Alaska 1981) (affirming the lower court’s dismissal of the students' claims that their school "fail[ed] to discover [their] learning disabilities or fail[ed] to provide [them] an appropriate educational program once [their] learning disabilities [we]re discovered”); Brantley v. District of Columbia, 640 A.2d 181 (D.C.App.1994) (denying the educational malpractice claim of a student who spent three years in second grade before the school district properly identified her learning disabilities and "provide[d] her with education suitable to her needs”); Rich v. Kentucky Country Day, Inc., 793 S.W.2d 832 (Ky.Ct.App.1990) (upholding the dismissal of a father’s claim that his son's private school “was negligent in failing to diagnose [the son’s] alleged psychological deficit” and "in ... failing to provide him with a personalized educational program adopted to that condition”); Hunter v. Board of Educ. Of Montgomery County, 292 Md. 481, 439 A.2d 582 (1982) (holding that parents' malpractice complaint against "the school system for negligently evaluating] the[ir son’s] learning disabilities” could not be maintained); Suriano v. Hyde Park Cent. Sch. Dist., 203 A.D.2d 553, 611 N.Y.S.2d 20 (1994) (dismissing plaintiff's claim that his "school breached a *1014 duty of care ... by promoting him from the first grade through the third grade despite his poor academic performance, by failing to detect a purported learning disability ..., [and] by failing to place him in a special education program to treat his learning disability").

. Only Montana has recognized the tort of educational malpractice. See B.M. v. State, 200 Mont. 58, 649 P.2d 425 (1982). There, the court held that “school authorities owed the [plaintiff] a duty of reasonable care in testing and placing her in an appropriate special education program.” Id. at 427. Other courts, however, have criticized the B.M. decision for "not recognizing or distinguishing [contrary case law] in the majority opinion." Moore, 386 N.W.2d at 114 n. 1. See also Brantley, 640 A.2d at 183 n. 4 (criticizing the Montana Supreme Court's decision for containing "no discussion of precedents from other jurisdictions").

. Moore, 386 N.W.2d at 114; see also Peter W., 60 Cal.App.3d at 824, 131 Cal.Rptr. 854 ("Unlike the activity of the highway or the marketplace, classroom methodology affords no readily acceptable standards of care, or cause, or injury.”); Swidryk, 493 A.2d at 642 (“|T]he conflicting theories of the science of pedagogy prevented the construction of a workable rule of care.").

. See, e.g., Donohue, 418 N.Y.S.2d 375, 391 N.E.2d at 1355 (“Factors such as the student's attitude, motivation, temperament, past experience and home environment may all play an essential.and immeasurable role in learning. Indeed, as the majority observes proximate cause might ‘be difficult, if not impossible, to prove.’ ") (Wachtler, J., concurring); Swidryk, 493 A.2d at 642 (" [F]ailure in schools could stem from a variety of factors including the student's physical, neurological, emotional, cultural and environmental background, as well as the actual system itself.").

. See, e.g., Suriano, 203 A.D.2d at 554, 611 N.Y.S.2d 20 (“In numerous cases, many of which involved allegations substantially similar to those in the matter at bar, the courts of this State have repeatedly refused to entertain educational malpractice causes of action because public policy precludes judicial interference with the professional judgment of educators and with educational policies and practices.”); Donohue, 418 N.Y.S.2d 375, 391 N.E.2d at 1354 (“To entertain a cause of action for ‘educational malpractice’ would require the courts not merely to make judgments as to the validity of broad educational policies — a course we have unalteringly eschewed in the past — but, more importantly to sit in review of the day-to-day implementations of those policies.”); Hunter, 439 A.2d at 585 (“|T]o allow petitioners' asserted negligence claims to proceed would in effect position the courts of this State as overseers of both the day-to-day operation of our educational process as well as the formulation of its governing policies.”).

. See, e.g., Ross v. Creighton University, 740 F.Supp. 1319, 1329 (N.D.Ill.1990) (citations omitted) (“If every failed student could seek tort damages against any teacher, administrator and school he feels may have shortchanged him at some point in his education, the courts could be deluged and schools shut down."), aff'd, 957 F.2d 410 (7th Cir.1992); Peter W., 60 Cal.App.3d at 825, 131 Cal.Rptr. 854 ("To hold [schools] to an actionable 'duty of care,' I in the discharge of their academic functions, would expose them to the tort claims — -real or imagined — of disaffected students and parents in countless numbers.").